NATIONAL LABOR RELATIONS BOARD *v.* DRIV-
ERS, CHAUFFEURS, HELPERS, LOCAL UNION
No. 639, INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA.

No. 34.   Argued January 14, 1960.—Decided March 28, 1960.

*Dominick L. Manoli* argued the cause for petitioner.
With him on the brief were *Solicitor General Rankin,
Stuart Rothman, Thomas J. McDermott* and *Norton J.
Come.*

*Herbert S. Thatcher* argued the cause for respondent. With him on the brief was *David Previant.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question in this case is whether peaceful picketing by a union, which does not represent a majority of the employees, to compel immediate recognition as the employees' exclusive bargaining agent, is conduct of the union "to restrain or coerce" the employees in the exercise of rights guaranteed in § 7,[1] and thus an unfair labor practice under § 8 (b)(1)(A) of the National Labor Relations Act, as amended by the Taft-Hartley Act.[2]

Curtis Bros., Inc., has a retail store and a warehouse in Washington, D. C., in which it carries on a moving, warehousing and retail furniture business. In 1953 respondent Teamsters Local 639 was certified by the National Labor Relations Board, following a Board-conducted election, to be the exclusive representative of the Company's drivers, helpers, warehousemen and furniture finishers. However, when the Local called a strike over

---

[1] Section 7, as amended by the Taft-Hartley Act, provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)." 49 Stat. 452, as amended, 61 Stat. 140, 29 U. S. C. § 157.

[2] Section 8 (b)(1)(A) provides in pertinent part:

"It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7 . . . ." 61 Stat. 141, 29 U. S. C. § 158 (b)(1)(A).

contract terms in February 1954 only nine of 21 employees in the unit left their jobs and Curtis Bros. replaced the nine with new employees. The strike continued but the Local gradually lost membership, and when after a year Curtis Bros. petitioned the Board to conduct another election, the Local wrote the Board that it did not claim to represent a majority of the employees. The Board nevertheless ordered another election, 114 N. L. R. B. 116, which was held in October 1955, and the then employees of the unit voted 28 to one in favor of "no union." [3]

A month after the election, in November 1955, the Local withdrew a picket line which had been maintained before the employees' entrance to the warehouse during the period from February 1954. However, picketing at the customers' entrance to the retail store was continued, but limited to not more than two pickets at any time. The pickets were orderly at all times and made no attempt to prevent anyone from entering the store. They simply patrolled before the entrance carrying signs reading on one side, "Curtis Bros. employs nonunion drivers, helpers, warehousemen and etc. Unfair to Teamsters Union No. 639 AFL," and on the other side, "Teamsters Union No. 639 AFL wants employes of Curtis Bros. to join them to gain union wages, hours, and working conditions."

After this picketing continued for about six months, Curtis Bros. made it the subject of an unfair labor practice charge against the Local for alleged violation of §8 (b)(1)(A). A complaint issued which alleged, in substance, that the picketing was activity to "restrain or coerce" the employees in the exercise of § 7 rights, and

---

[3] The nine strikers who had been replaced were not permitted to vote in the election. Cf. § 9 (c)(3), as amended by § 702 of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 542, which permits striking employees who have been replaced to vote under certain circumstances.

thus an unfair labor practice under § 8 (b)(1)(A), because it was "recognitional" picketing, that is, picketing designed to induce Curtis Bros. to recognize the Local as the exclusive bargaining agent for the employees, although the union did not represent a majority of the employees.

The Trial Examiner recommended that the complaint be dismissed on the ground that the Local's peaceful picketing, even if "recognitional," was not conduct to "restrain or coerce." The Board, one member disssenting, disagreed and entered a cease-and-desist order, 119 N. L. R. B. 232. On review at the instance of the Local, the United States Court of Appeals for the District of Columbia Circuit, by a divided court, set aside the Board's order, holding that § 8 (b)(1)(A) "is inapplicable to peaceful picketing, whether 'organizational' or 'recognitional' in nature . . . ." 107 U. S. App. D. C. 42, 43, 274 F. 2d 551, 552.[4] Because of the importance of the question in the administration of the Act, we granted certiorari. 359 U. S. 965.

After we granted certiorari, the Congress enacted the Labor-Management Reporting and Disclosure Act of 1959, which, among other things, adds a new § 8 (b)(7) to the National Labor Relations Act.[5] It was stated

---

[4] Accord: *Labor Board* v. *International Brotherhood of Teamsters, Local No. 182,* 272 F. 2d 85 (C. A. 2d Cir.). Contra: *Labor Board* v. *United Rubber Workers,* 269 F. 2d 694 (C. A. 4th Cir.), cert. granted and judgment reversed, *post,* p. 329.

[5] New § 8 (b)(7) provides:

"It shall be an unfair labor practice for a labor organization or its agents—

.     .     .     .     .

"(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organiza-

by the Board on oral argument that if this case arose under the 1959 Act, the Board might have proceeded against the Local under § 8 (b)(7). This does not, however, relegate this litigation to the status of an unimportant controversy over the meaning of a statute which has been significantly changed. For the Board contends that new § 8 (b)(7) does not displace § 8 (b)(1)(A) but merely "supplements the power already conferred by Section 8 (b)(1)(A)." [6] It argues that the Board may

---

tion as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

"(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9 (c) of this Act,

"(B) where within the preceding twelve months a valid election under section 9 (c) of this Act has been conducted, or

"(C) where such picketing has been conducted without a petition under section 9 (c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9 (c)(1) or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

"Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8 (b)." 73 Stat. 544.

[6] The Solicitor General stated in a memorandum filed in this Court on October 21, 1959, in another case—*Rubber Workers* v. *Labor Board, post*, p. 329—with reference to the several cases raising the "so-called

proceed against peaceful "recognitional" picketing conducted by a minority union in more situations than are specified in § 8 (b)(7) and without regard to the limitations of § 8 (b)(7)(C).[7]

Basic to the right guaranteed to employees in § 7 to form, join or assist labor organizations, is the right to engage in concerted activities to persuade other employees to join for their mutual aid and protection. Indeed, even before the Norris-LaGuardia Act, 47 Stat. 70, and the Wagner Act, 49 Stat. 449, this Court recognized a right in unions to "use all lawful propaganda to enlarge their membership." *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 209. However, the Taft-Hartley Act added another right of employees also guaranteed protection, namely, the right to refrain from joining a

*Curtis* issue," that the passage of the 1959 Act injected "additional considerations [which] may, in the Court's view, warrant remand . . . to the Board for further examination in the light of" the 1959 Act. However, remand of this case would serve no purpose. After the Solicitor General made the suggestion the Board, on November 17, 1959, considered a case which arose prior to the 1959 Act. The Board, with four of its five members sitting, examined its position as to the scope of § 8 (b)(1)(A) in the light of the 1959 Act and by a vote of three to one decided that the doctrine announced in this, the *Curtis Bros.,* case was in no way affected by the 1959 Act, stating that "[C]ontrary to our dissenting colleague, we believe that the new provisions concerning recognition and/or organizational picketing merely amplify the . . . Section 8 (b) proscriptions. . . ." *Local 208, International Brotherhood of Teamsters* (*Sierra Furniture Co.*), 125 N. L. R. B. 159, 162, n. 6.

[7] The Board does not rely, as support for its order here under § 8 (b)(1)(A), upon the fact that the Local picketed after the election. In *Local 208, International Brotherhood of Teamsters* (*Sierra Furniture Co.*), 125 N. L. R. B. 159, a like order was issued against peaceful "recognitional" picketing although no election had been held. We agree with the Board that if § 8 (b)(1)(A) confers power on the Board to proceed against such picketing, Congress did not limit its application to picketing following the conduct of an election at which the employees reject the union as their representative.

union, except as that right might be affected by an agreement authorized in § 8 (a)(3). Thus tension exists between the two rights of employees protected by § 7—their right to form, join or assist labor organizations, and their right to refrain from doing so. This tension is necessarily quite real when a union employs economic weapons to organize employees who do not want to join the union. The Board held here that peaceful picketing is not lawfully employed as an economic weapon to further self-organization if its objective is "recognitional." The Board stated: "Because the object of the Union's picketing in this case was to force the Company to commit an act prohibited by the statute itself [that is, to recognize and contract with the Local although it was not the chosen representative of a majority of the Curtis Bros. employees] and directly to deprive the employees of a right expressly guaranteed to them by the same Act, there is no occasion here to balance conflicting interests or rights." 119 N. L. R. B. 232, 238.[8] It therefore found

---

[8] The Board does not say, however, that a union which does not represent a majority of the employees will always violate § 8 (b)(1)(A) if it peacefully pickets an employer to organize his employees, even, as here, if the picketing is carried on after the union has been rejected by the employees in a Board-conducted election. The Board says in its brief that the picketing is "organizational" and not "recognitional" if its purpose is "merely to organize the employees, with a view to demanding recognition in the future should majority support be acquired." The Board's view is that, if the picketing is "organizational," a different question may be presented under § 8 (b)(1)(A)—that in such case its function to balance the competing rights of the union and the employees under § 7 may be invoked, and the picketing found to be privileged because the balance may be struck in favor of "a competing interest which the Act [§ 7] recognizes," namely, the right to form, join or assist labor organizations.

If § 8 (b)(1)(A) empowers the Board to proceed against peaceful picketing in any circumstances, the validity of a distinction in coverage between peaceful "organizational" and "recognitional" picketing

no justification for the threat to the employees' job security which was thought to be inherent in the economic pressure directed against the employer by the picketing. It was this threat which was said to taint peaceful picketing as unlawful conduct to "restrain or coerce" which the Board might forbid.

We first consider § 8 (b)(1)(A) in the light of § 13, as amended, which provides, in substance, that the Taft-Hartley Act shall not be taken as restricting or expanding either the right to strike or the limitations or qualifications on that right, as these were understood prior to 1947, unless "specifically provided for" in the Act itself.[9]  The Wagner Act conferred upon the Board wide authority to protect strikers from employer retaliation.   However, the Court and the Board fashioned the doctrine that the Board should deny reinstatement to strikers who engaged in strikes which were conducted in an unlawful manner or for an unlawful objective.   See for example *Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31; *Labor Board* v. *Fansteel Metallurgical Corp.,* 306 U. S. 240; *Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332; and *American News Co.,* 55 N. L. R. B. 1302.   These are the "limitations or qualifications" on the right to strike referred to in § 13.

---

has been challenged.  See Cox, Some Current Problems in Labor Law: An Appraisal, 35 L. R. R. M. 48, 53–57; Bornstein, Organizational Picketing in American Law, 46 Ky. L. J. 25; Isaacson, Organizational Picketing: What is the Law?—Ought the Law to be Changed?  8 Buffalo L. R. 345.  New § 8(b)(7) does not make the distinction.

[9] Section 13 provides:

"Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."  61 Stat. 151, 29 U. S. C. § 163.

Picketing has been equated with striking for the purposes of § 13. See, *e. g., Labor Board* v. *International Rice Milling Co.,* 341 U. S. 665.  Cf. *International Brotherhood of Teamsters, Local No. 807 (Schultz Refrigerated Service, Inc.),* 87 N. L. R. B. 502.

See S. Rep. No. 105, 80th Cong., 1st Sess. 28. The Board makes no claim that prior to 1947 it was authorized, because of any "limitation" or "qualification," to issue a cease-and-desist order against peaceful "recognitional" picketing; indeed the full protections of the Norris-LaGuardia Act extended to peaceful picketing by minority unions for recognition. See *Fur Workers Union No. 21238* v. *Fur Workers Union, Local No. 72,* 308 U. S. 522, *per curiam* affirming 70 App. D. C. 122, 105 F. 2d 1; *Lauf* v. *Shinner & Co.,* 303 U. S. 323. Therefore, since the Board's order in this case against peaceful picketing would obviously "impede" the right to strike, it can only be sustained if such power is "specifically provided for" in § 8 (b)(1)(A), as added by the Taft-Hartley Act. To be sure, § 13 does not require that the authority for the Board action be spelled out in so many words. Rather, since the Board does not contend that § 8 (b)(1)(A) embodies one of the "limitations or qualifications" on the right to strike, § 13 declares a rule of construction which cautions against an expansive reading of that section which would adversely affect the right to strike, unless the congressional purpose to give it that meaning persuasively appears either from the structure or history of the statute. Therefore, § 13 is a command of Congress to the courts to resolve doubts and ambiguities in favor of an interpretation of § 8 (b)(1)(A) which safeguards the right to strike as understood prior to the passage of the Taft-Hartley Act.

The Board asserts that the very general standard in § 8 (b)(1)(A) vests power in the Board to sit in judgment upon, and to condemn, a minority union's resort to a specific economic weapon, here peaceful picketing. The structure of § 8 (b), which defines unfair labor practices, hardly supports the Board's claims.. Earlier this Term we pointed out that "Congress has been rather specific when it has come to outlaw particular economic weapons

on the part of unions." *Labor Board* v. *Insurance Agents' International Union,* 361 U. S. 477, 498. We referred to § 8 (b)(4) as illustrative of the congressional practice.[10] In the context of a union's striking to promote enlarged membership, Congress there explicitly prohibited a union's resort to the secondary boycott, to the strike to force em-

---

[10] Section 8 (b)(4) provides:

"It shall be an unfair labor practice for a labor organization or its agents—

.          .          .          .          .

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9; (C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 9; (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: *Provided,* That nothing contained in this subsection (b) shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act."

ployers or self-employed persons to join unions, and, very pertinent here, to the "recognitional" strike where another union is certified. Plainly if the Board's interpretation is sustained, § 8 (b)(1)(A) largely overlaps at least this last-mentioned prohibition, namely § 8 (b)(4)(C), to the extent of making it almost redundant.[11]  But the Court has rejected an argument that a provision of § 8 (b)(4) is a repetition of the prohibitions of § 8 (b)(1)(A).  In *International Brotherhood of Electrical Workers* v. *Labor Board*, 341 U. S. 694, the Court, in holding that a peaceful strike to promote self-organization was proscribed by § 8 (b)(4)(A) if its objective was to "induce or encourage" a secondary boycott, contrasted the language of the two subsections and labeled the words "restrain or coerce" in § 8 (b)(1)(A) a "restricted phrase" to be equated with "threat of reprisal or force or promise of benefit."  *Id.*, at 701–703.

In the sensitive area of peaceful picketing Congress has dealt explicitly with isolated evils which experience has established flow from such picketing.  Therefore, unless there is the clearest indication in the legislative history of § 8 (b)(1)(A) supporting the Board's claim of power under that section, we cannot sustain the Board's order here.  We now turn to an examination of the legislative history.

---

[11] If peaceful "recognitional" picketing by a minority union may be prohibited under § 8 (b)(1)(A) whenever it occurs, the only independent coverage of § 8 (b)(4)(C) would be when a *majority* union pickets for recognition in the face of another union's being certified.  Although § 8 (b)(4)(C) may cover such a situation, a question which we do not have to decide, any suggestion that it was placed in the statute primarily because of a solicitude for a minority union whose certification is formally unrevoked is without any support in the legislative history.  See S. Rep. No. 105, 80th Cong., 1st Sess. 22; H. R. Conf. Rep. No. 510 on H. R. 3020, 80th Cong., 1st Sess. 44; 93 Cong. Rec. 3838.

In the comprehensive review of union practices leading up to the enactment of the Taft-Hartley Act, picketing practices were subjected to intensive inquiry by both House and Senate Labor Committees. The Senate bill, as brought to the floor by the Senate Labor Committee regulated organizational activity in specified situations. Proposed § 8 (b)(4)(3), now § 8 (b)(4)(C) of the law, made "recognitional" picketing of a primary employer unlawful only where "another labor organization has been certified as the representative" of his employees. Section 8 (b)(4)(2), now § 8 (b)(4)(B), prohibited attempts to force recognition through secondary pressure.

However, five members of the Senate Labor Committee, including Senators Taft and Ball, believed that the Senate bill did not go far enough in the regulation of practices employed by unions for organizational purposes. These Senators introduced on the floor a proposed amendment to the Committee bill. The amendment as originally phrased was the counterpart of § 8 (a)(1) applicable to employers; it would have made it an unfair labor practice for a labor organization "to interfere with" as well as "to restrain or coerce employees in the exercise of the rights guaranteed in § 7 . . . ." The words "interfere with" were dropped during the debate, but except for this change, the amendment became § 8 (b)(1)(A).

The report of supplemental views which announced the five Senators' intention to propose the amendment identifies the abuses which the section was designed to reach. That report states: "The committee heard many instances of union coercion of employees such as that brought about by threats of reprisal against employees and their families in the course of organizing campaigns; also direct interference by mass picketing and other violence. Some of these acts are illegal under State law, but we see no reason why they should not also constitute

unfair labor practices to be investigated by the National Labor Relations Board, and at least deprive the violators of any protection furnished by the Wagner Act." S. Rep. No. 105, 80th Cong., 1st Sess. 50. Similar expressions pervaded the Senate debates on the amendment. The note repeatedly sounded is as to the necessity for protecting individual workers from union organizational tactics tinged with violence, duress or reprisal. Senator Ball cited numerous examples of organizing drives characterized by threats against unorganized workers of violence, job reprisals and such repressive assertions as that double initiation fees would be charged those who delayed joining the union. 93 Cong. Rec. 4016–4017. When Senator Ives objected to the words "interfere with" as too broad, Senator Taft insisted that even those words would have a limited application and would reach "reprehensible" practices but not methods of peaceful persuasion. He continued:

> "Why should a union be able to go to an employee and threaten violence if he does not join the union? Why should a union be able to say to an employee, 'If you do not join this union we will see that you cannot work in the plant'? . . . We know that such things have actually occurred. We know that men have been threatened. There have been many cases in which unions have threatened men or their wives. They have called on them on the telephone and insisted that they sign bargaining cards. They have said to them, 'Sooner or later we are going to organize this plant with a closed shop, and you will be out.' . . ." 93 Cong. Rec. 4021.

It is true that here and there in the record of the debates there are isolated references to instances of conduct which might suggest a broader reach of the amendment. See

for example 93 Cong. Rec. 4023–4024.[12] But they appear more as asides in a debate, the central theme of which was not the curtailment of the right peacefully to strike, except as provided in § 8 (b)(4), but the elimination of the use of repressive tactics bordering on violence or involving particularized threats of economic reprisal. The plainest indication negating an intention to restrict the use by unions of methods of peaceful persuasion, including peaceful picketing, is seen in the comments of Senator Taft near the close of the debate. He said:

> "It seems to me very clear that so long as a union-organizing drive is conducted by persuasion, by propaganda, so long as it has every legitimate purpose, the Board cannot in any way interfere with it. . . ." 93 Cong. Rec. 4434.

> "The effect of the pending amendment is that the Board may call the union before them, exactly as it

[12] It is not at all clear that these references support the suggested inference. The context in which they appear is that early in the debate Senator Pepper had urged that employees do not need protection from union leaders because these leaders can be controlled through union elections. Senator Taft denied this, and gave one example in which a union which represented some employees in the plant seeking to organize other unwilling employees, "coerced them" by threats to "close down" the plant in which they worked thereby depriving them of their jobs.

"The dockmen in that case were not striking for any particular benefit for themselves, but they were striking to coerce the other employees to leave the union of which they were members, and to join the other union—clearly an improper course of action, and clearly a matter which should be restrained by the National Labor Relations Board." 93 Cong. Rec. 4023.

Again, replying to Senator Pepper, Senator Taft cited an instance in which picketing closed a plant for several months. Senator Taft observed, "[c]oercion is not merely against union members; it may be against all employees." 93 Cong. Rec. 4024.

has called the employer, and say, 'Here are the rules of the game. You must cease and desist from coercing and restraining the employees who want to work from going to work and earning the money which they are entitled to earn.' The Board may say, 'You can persuade them; you can put up signs; you can conduct any form of propaganda you want to in order to persuade them, but you cannot, by threat of force or threat of economic reprisal, prevent them from exercising their right to work.' As I see it, that is the effect of the amendment." 93 Cong. Rec. 4436.

. . . . .

"The Senator says it will slow up organizational drives. It will slow up organizational drives only if they are accompanied by threats and coercion. The cease-and-desist order will be directed against the use of threats and coercion. It will not be directed against the use of propaganda or the use of persuasion, or against the use of any of the other peaceful methods of organizing employees.

"Mr. President, I can see nothing in the pending measure which, as suggested by the Senator from Oregon, would in some way outlaw strikes. It would outlaw threats against employees. It would not outlaw anybody striking who wanted to strike. It would not prevent anyone using the strike in a legitimate way, conducting peaceful picketing, or employing persuasion. All it would do would be to outlaw such restraint and coercion as would prevent people from going to work if they wished to go to work." *Ibid.*

This approach in the Senate is in sharp contrast to the House view, which was that picketing should be strictly circumscribed. The House passed a bill imposing drastic

limitations upon the right to picket. Section 12 (a)(1) of that bill dealt specifically with the use of force and threats of force, but especially pertinent here are §§ 12 (a)(2) and 12 (a)(3)(C) which went far beyond this. The former would have outlawed all picketing of "an employer's premises for the purpose of leading persons to believe that there exists a labor dispute involving such employer, in any case in which the employees are not involved in a labor dispute with their employer." And the latter would have banned picketing "an object of which [was] (i) to compel an employer to recognize for collective bargaining a representative not certified under section 9 . . . or (iii) to compel an employer to violate any law . . . ." H. R. 3020, 80th Cong., 1st Sess. 47–49. Plainly the Local's conduct in the instant case would have been prohibited if the House bill had become law.

But the House conferees abandoned the House bill in conference and accepted the Senate proposal. H. R. Conf. Rep. No. 510 on H. R. 3020, 80th Cong., 1st Sess. 42.[13] They joined in a Conference Report which stated that "the primary strike for recognition (without a Board certification) was not prohibited." Id., at 43.

This history makes pertinent what the Court said in Local 1976, United Brotherhood of Carpenters v. Labor Board, 357 U. S. 93, 99–100: "It is relevant to recall that the Taft-Hartley Act was, to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views on the role of organized labor in the free economic life of the Nation and the appro-

---

[13] The Conference Report states that § 8 (b)(1)(A) of the Senate version covers "all of the activities which were proscribed in section 12 (a)(1) of the House bill as unlawful concerted activities and some of the activities which were proscribed in the other paragraphs of section 12 (a)."

priate balance to be struck between the uncontrolled power of management and labor to further their respective interests. This is relevant in that it counsels wariness in finding by construction a broad policy . . . as such when, from the words of the statute itself, it is clear that those interested in just such a condemnation were unable to secure its embodiment in enacted law." Certainly due regard for this admonition quite apart from the caveat in § 13 requires caution against finding in the nonspecific, indeed vague, words, "restrain or coerce" that Congress intended the broad sweep for which the Board contends.

We conclude that the Board's interpretation of § 8 (b)(1)(A) finds support neither in the way Congress structured § 8 (b) nor in the legislative history of § 8 (b)(1)(A). Rather it seems clear, and we hold, that Congress in the Taft-Hartley Act authorized the Board to regulate peaceful "recognitional" picketing only when it is employed to accomplish objectives specified in § 8 (b)(4); and that. § 8 (b)(1)(A) is a grant of power to the Board limited to authority to proceed against union tactics involving violence, intimidation, and reprisal or threats thereof—conduct involving more than the general pressures upon persons employed by the affected employers implicit in economic strikes.

The Board's own interpretation for nearly a decade after the passage of the Taft-Hartley Act gave § 8 (b)(1)(A) this limited application. See, *e. g., National Maritime Union,* 78 N. L. R. B. 971, enforcement granted, 175 F. 2d 686; *Local 74, United Brotherhood of Carpenters (Watson's Specialty Store),* 80 N. L. R. B. 533, enforcement granted, 181 F. 2d 126, affirmed, 341 U. S. 707; *Perry Norvell Co.,* 80 N. L. R. B. 225; *Miami Copper Co.,* 92 N. L. R. B. 322; *Medford Building & Construction Trades Council (Kogap Lumber Industries),* 96

N. L. R. B. 165; *District 50, United Mine Workers* (*Tungsten Mining Corp.*), 106 N. L. R. B. 903. In *Perry Norvell, supra,* at 239, the Board declared:

"By Section 8 (b)(1)(A), Congress sought to fix the rules of the game, to insure that strikes and other organizational activities of employees were conducted peaceably by persuasion and propaganda and not by physical force, or threats of force, or of economic reprisal. In that Section, Congress was aiming at means, not at ends."

The Board dismisses these cases as "dubious precedent." 119 N. L. R. B., at 246. We think they gave a sounder construction to § 8 (b)(1)(A) than the Board's construction in the present case.

We are confirmed in our view by the action of Congress in passing the Labor-Management Reporting and Disclosure Act of 1959. That Act goes beyond the Taft-Hartley Act to legislate a comprehensive code governing organizational strikes and picketing and draws no distinction between "organizational" and "recognitional" picketing. While proscribing peaceful organizational strikes in many situations, it also establishes safeguards against the Board's interference with legitimate picketing activity. See § 8 (b)(7)(C).[14] Were § 8 (b)(1)(A) to have the sweep contended for by the Board, the Board might proceed against peaceful picketing in disregard of these safeguards. To be sure, what Congress did in 1959 does not establish what it meant in 1947. However, as another major step in an evolving pattern of regulation of union conduct, the 1959 Act is a relevant consideration. Courts may properly take into account the later Act when asked to extend the reach of the earlier Act's vague language to the limits which, read literally, the words might

[14] See note 5, *supra.*

permit. We avoid the incongruous result implicit in the Board's construction by reading § 8 (b)(1)(A), which is only one of many interwoven sections in a complex Act, mindful of the manifest purpose of the Congress to fashion a coherent national labor policy.

*Affirmed.*

Memorandum of MR. JUSTICE STEWART, with whom MR. JUSTICE FRANKFURTER and MR. JUSTICE WHITTAKER join.

At the time the writ of certiorari was granted in this case, it clearly appeared that there was involved an "important question of federal law which has not been, but should be, settled by this court." See Rule 19, of the Revised Rules of the Supreme Court of the United States. Subsequently, however, Congress enacted the Labor-Management Reporting and Disclosure Act of 1959. Section 704 (c) of that statute added to the National Labor Relations Act a new provision, § 8 (b)(7), which bans picketing for recognition or organizational purposes where: (A) the employer is lawfully recognizing another labor organization and a question concerning representation may not appropriately be raised under § 9; (B) within the preceding 12 months a valid election has been conducted; or (C) the picketing has been going on for an unreasonable period of time without a representation petition having been filed. See, *ante,* p. 277, note 5.

This new statutory provision seems squarely to cover the type of conduct involved here, and I would remand this case to the Board for reconsideration in the light of the 1959 legislation, as suggested by the Solicitor General.*

*The single sentence in a footnote to an opinion joined by but three members of the Board, referred to in note 6 of the Court's opinion, *ante,* p. 279, hardly reflects the kind of reconsideration which I have in mind, and certainly does not stand in the way of a more thorough re-examination by the Board.