Clifford W. POTTER, Regional Director of the Twenty-Third Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNITED PLANT GUARD WORKERS OF AMERICA, Respondent.

Civ. A. No. 13536.

United States District Court
S. D. Texas,
Houston Division.

March 17, 1961.

---

---

Jerome L. Avedon, Atty., N. L. R. B., Washington, D. C., for petitioner.

Sam Houston Clinton, Jr., Austin, Tex., for respondent.

Baker, Botts, Andrews & Shepherd (V. R. Burch, Jr.), Houston, Tex., for Houston Armored Car Co., Inc.

INGRAHAM, District Judge.

Petitioner, on behalf of the National Labor Relations Board, seeks a temporary injunction to stay alleged unfair labor practices on the part of respondent union until final disposition is made of a controversy between Houston Armored Car Company, Inc., (hereinafter called Company) and respondent by the Board. Such request for temporary injunction has the sanction of statutory law (Sec. 10(*l*), National Labor Relations Act, as amended, 29 U.S.C.A. § 160(*l*).[1]

---

1. Sec. 10(*l*) of the Act provides in pertinent part:

"Whenever it is charged that any person has engaged in an unfair labor prac-

The scope of the inquiry permitted the district court upon such petition is quite narrow. The court is to ascertain only whether there is "reasonable cause to believe" that a violation of the National Labor Relations Act (hereinafter called the Act), as charged, has been committed. This court is to grant such equitable relief "as it deems just and proper" to preserve the status quo until the Board determines the merits of the controversy. See these illustrative cases: McLeod for and on Behalf of N. L. R. B. v. Local 294, International Brotherhood of Teamsters, etc., D.C.N.D.N.Y.1959, 190 F.Supp. 129; Douds v. Milk Drivers and Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534; and Le Bus v. Locals 406, 406A, 406B, 406C, etc., D.C.E.D.La.1956, 145 F.Supp. 316.

The alleged violations charged are under Sec. 8(b) (4) (i) (ii), subparagraph (B) of the Act, 29 U.S.C.A. § 158, which section proscribes so-called secondary boycotts and other secondary pressure.[2] There follows a concise statement of the facts adduced at the hearing of March 2, 1961.

Company is engaged at Houston, Texas, in the operation of an armored car service company. Its annual business meets jurisdictional requisites. J. C. Penney Company (hereinafter Penney), F. W. Woolworth Company (Woolworth), and Wyatt Cafeteria (Wyatt) are engaged at Houston, Texas, in the opera-

tice within the meaning of paragraph (4) (A), (B), or (C) of Section 8(b), or Section 8(e), or Section 8(b) (7), the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States * * * within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper * * *"

2. Sec. 8(b) (4) (i) (ii), subparagraph B, of the Act provides in pertinent part:
"Section 8 * * * (b) It shall be an unfair labor practice for a labor organization or its agents * * * (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or

(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is: * * * (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing; * * * Provided further, that for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute, and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any other person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution; * * *"

tion of retail stores. Blue Ribbon Packing Company (Blue Ribbon) is engaged at Houston, Texas, in the operation of a meat packing plant. All these establishments meet jurisdictional amount requirements. Respondent United Plant Guard Workers of America, a labor organization, at all times material herein has been engaged within this judicial district in transacting business and promoting and protecting the interests of the employee members of respondent.

In its armored car service Company picks up and delivers cash and other valuables from retail stores, banks, insurance companies, and industrial plants in the vicinity of Houston. On October 21, 1960, respondent was certified as the collective bargaining representative for Company's employees after winning a Board-conducted representation election. The parties negotiated unsuccessfully for a collective bargaining contract until December 23, 1960, at which time respondent commenced a strike against Company. The union has picketed Company's office, to which its employees report numerous times each day, ever since.

Starting early in January 1961 respondent caused its members to follow Company's armored trucks to the stores or premises of persons who utilize its services. When a Company truck arrived at a client's establishment, striking employees, whose number would vary between two and nine, would stand at the entrance to the store or premises of the client, and distribute handbills to the store's customers. This handbilling occurred particularly at the premises of Penney, Woolworth, Wyatt and Blue Ribbon. Employees of these secondary employers often requested copies of the handbills, and respondent's members gave them copies. The handbills distributed by respondent state the nature of the union's dispute with Company and contain the following:

"To break our strike, scabs and strike-breakers are trying to operate the vehicles which we would be driving but for the strike. They are de-

livering to this store or place of business products or articles (currency, change, etc.). This store or place of business is, in turn, using or distributing the same to you, its customers.

Help Us Win Decent Wages, Hours and Working Conditions While the Strike Continues Please Do Not Patronize!"

While distributing the aforesaid handbills respondent's members orally appealed to customers of the firm doing business with Company not to go upon the premises of or transact business with such customers of Company. Some of Company's customers discontinued its services after commencement of the strike and secondary activity complained of. There is, however, no testimony to the effect that any individual employed by Penney, Woolworth, Wyatt, Blue Ribbon, or anyone else refused to work for these secondary employers as a direct result of the handbills. It is clear though that employees of the secondary employers received handbills in some instances.

Certain other facets of this handbilling at secondary employers' premises should be noted. Handbilling in the main occurred at customers', rather than employees', entrances. This activity normally commenced after the stores were open for business when customers, rather than employees, were expected to be entering through customer entrances. Handbilling was limited in duration strictly to the period of time when Company's armored car was on the premises.

Petitioner predicates a Sec. 8(b) (4) (i) (ii) offense also upon picketing which commenced on January 24, 1961, at the premises of Company's customers. Injunctive relief is sought against such picketing. However illegal this secondary picketing may have been, it terminated after a duration of but three days. The picketing was terminated one day before the charge was filed with the Board and four days before respondent's representative learned that the charge

had been filed. At the hearing it was manifestly obvious that respondent has no intention of further picketing. Under these circumstances a temporary injunction against picketing is patently unwarranted and will be denied. No further reference will be made herein to the picketing charge.

Petitioner charges that upon these facts there is "reasonable cause to believe" that this handbilling violates Sec. 8(b) (4) (i) (ii), subparagraph (B), of the Act, in these three respects: (1) by handbilling, respondent "has engaged in * * * strikes or refusals in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on goods, articles, materials, or commodities, or to perform services" for the proscribed object of forcing Penney, Woolworth, Wyatt and Blue Ribbon to cease doing business with Company; (2) by handbilling, respondent "has induced and encouraged individuals employed by Penney, Woolworth, Wyatt, Blue Ribbon * * * to engage in strikes or refusals in the course of their employment to use * * * or otherwise handle or work on goods * * * or to perform services" for a proscribed object; and (3) by handbilling, respondent "has threatened, coerced annd restrained Penney, Woolworth, Wyatt, Blue Ribbon * * *" for a proscribed object. Respondent, of course, admits the handbilling. It denies these three allegations.

■ Regarding count or allegation 1, no mention of this allegation or facts deemed to support it is made in petitioner's memorandum. In any event, it is plainly untenable. This allegation alleges permissive primary pressure, not forbidden secondary tactics. I turn then to the issue of whether there is "reasonable cause" to believe that this handbilling induces or encourages secondary employees to engage in a strike or refusal to use or transport, and the like, goods or services of Company within the meaning of Section 8(b) (4) (i) of the Act.

■ The legality of handbilling cannot be determined in a vacuum. It is primarily a factual determination. Secondary employees herein asked for and received these handbills. Despite the fact that no secondary employees are shown to have engaged in a concerted refusal to deal with Company's services and goods as a direct result of handbilling, I think it possible for the Board to entertain a reasonable belief that handbilling "induces" or "encourages" prohibited effects in secondary employees. Handbilling may well have such effects on secondary employees if continued. There is "reasonable cause to believe" that the handbilling was done with the object of influencing secondary employees. That the handbilling was also carried on for the purpose of truthfully advising consumers or customers of a labor dispute does not insulate the handbilling from possible illegality. The two objects—one legal and the other illegal—are not mutually exclusive. It is true that there was much testimony from the leader or representative and members of respondent union as to the innocence of their purpose or object in handbilling. The credibility of the union representative is, of course, for this court as factfinder, and such testimony as to union purposes in this matter may be rejected if not believed. In short, handbilling of this sort may "have an effect of inducing any individual"—secondary employee to refuse to perform services at the secondary business site, even though no actual refusal by secondary employees ever in fact occurred. One may be very thoroughly "induced" to do an act that he simply does not do. It should further be noted that some customers of Company have quit using its services since this secondary pressure started. It would be a bit fatuous to assume this is only coincidental.

■ Admittedly, there is a divergence of opinion among board trial examiners, as reflected in their intermediate reports, as to the legality under these new sections of such handbilling. Two injunction cases support my conclusion. These are Potter v. Plumbers & Pipefitters Local Union No. 142,

D.C.W.D.Tex.1960, 192 F.Supp. 641, and Phillips v. Local 662, Radio & Television Engineers, D.C.E.D.Tenn.1960, 192 F. Supp. 643. In Potter, the union had a dispute with a firm which installed refrigeration equipment in Piggly-Wiggly supermarkets. The union, in addition to picketing the site where a new Piggly-Wiggly supermarket was being built, went to other Piggly-Wiggly stores and distributed handbills telling of its dispute and requesting customers not to patronize Piggly-Wiggly. Judge Ben H. Rice, Jr., finding such leaflet distribution not protected by the proviso to Section 8 (b) (4), issued an injunction restraining the union from distribution of handbills at Piggly-Wiggly stores. In Phillips, the court held that distribution of handbills to union members and customers of a struck radio station, requesting the recipient not to advertise over the radio station or deal with firms so advertising, was not within the protection of the proviso to Section 8(b) (4). In sum, therefore, I am satisfied that petitioner has "reasonable cause to believe" that respondent is engaged in a Section 8(b) (4) (i) offense by the handbilling, and that appropriate injunctive relief should be given as to this charge.

As to petitioner's charge that this handbilling also violates Section 8(b) (4) (ii) of the Act, I reach a different conclusion. The issue posed by such contention is whether the handbilling "threaten(s), coerce(s), or restrain(s) any person" with the prohibited object, etc. "Threaten", "restrain" and "coerce" are words indicative of stronger conduct or activities than "induce" or "encourage". "Induce" and "encourage" have been in the law since 1947 and these words have received a settled judicial interpretation. Knowing of this judicially declared meaning of the phrase, Congress could have used the Section 8(b) (4) (i) language in Section 8(b) (4) (ii) had it wanted to insulate "any person" from any form of influence and persuasion. Congressional draftsmen chose not to do so. Instead, they chose "threaten, coerce, or restrain", words which do not reach or prohibit "influence and persuasion".

 The instant handbilling is not coercion nor threats within Section 8(b) (4) (ii) in my opinion. That petitioner's belief that Section 8(b) (4) (ii) is here violated is not a reasonable one is supported by the rationale of these cases: Drivers, Chauffeurs and Helpers Local 639, etc. v. N. L. R. B., 1958, 107 U.S. App.D.C. 42, 274 F.2d 551, affirmed 1960, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710; N. L. R. B. v. I. A. M. Lodge 942, 9 Cir., 1959, 263 F.2d 796; and N. L. R. B. v. International Ladies' Garment Workers' Union, 3 Cir., 1960, 274 F.2d 376. That peaceful distribution of handbills was not intended to be included within the coverage of Section 8(b) (4) (ii) is emphasized by the legislative history of these 1959 sections.[3]

A temporary injunction will issue against respondent's handbilling upon the ground that petitioner has "reasonable cause to believe" that such conduct violates Section 8(b) (4) (i) of the Act. This injunction will be considered in force upon the filing of this memorandum and the notice given to counsel by receiving a copy hereof. Clerk will notify counsel to draft and submit decree accordingly.

---

3. Senator Kennedy, Chairman of Senate conferees, explained the purpose of Sec. 8(b) (4) (ii) as follows during floor debate on the conference report, 105 Daily Cong.Rec. 16414:

"We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but we were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing. In other words, *the union can hand out handbills at the shop,* can place advertisements in newspapers, can make announcements over the radio, and can carry on all publicity short of having ambulatory picketing in front of a secondary site." (Emphasis supplied.)