NATIONAL MARITIME UNION OF
AMERICA, AFL–CIO, Rick Miller
and Robert Collileux, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 18066.

United States Court of Appeals
Eighth Circuit.

Oct. 10, 1966.

Rehearing Denied Nov. 3, 1966.

Charles Sovel, New York City, for petitioners. Abraham E. Freedman, New York City, was with him on the brief.

Elliott Moore, Atty., N. L. R. B., Washington, D. C., for respondent. Arnold Ordman, Gen. Counsel Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Paul M. Thompson, Atty., N. L. R. B., Washingon, D. C., were with him on the brief.

Pierce Butler, III, of Doherty, Rumble & Butler, St. Paul, Minn., filed amicus curiae brief for Farmers Union Grain Terminal Ass'n.

Before VOGEL, Chief Judge, BLACK-MUN, Circuit Judge, and STEPHEN-SON, District Judge.

BLACKMUN, Circuit Judge.

We are confronted again with an issue of alleged secondary picketing and the interpretation, in a setting of somewhat unusual facts, of § 8(b) (4) of the National Labor Relations Act as amended by the Landrum-Griffin Act of 1959, 29 U.S.C. § 158(b) (4). Jurisdiction is established.

National Maritime Union of America, AFL–CIO (which we designate herein as NMU), Rick Miller, its national vice-president, and Robert Collileux, its employee, seek to set aside an order of the National Labor Relations Board issued June 11, 1965, and reported as 152 N.L.R.B. No. 149. The Board in turn requests enforcement of its order. The charging party, Farmers Union Grain Terminal Association (Farmers), has filed a brief amicus curiae favoring enforcement.

Except for a footnote relating to briefs and of no significance here, the Board panel unanimously adopted the findings, conclusions and recommendations of the trial examiner. It thereby determined that NMU in the course of an economic strike against Mid-America Transportation Company (MAT), attempted to and did induce employees of secondary employers to engage in work stoppage and threatened, coerced or restrained those employers with an object of forcing them to cease doing business with MAT, and thereby violated § 8(b)

(4) (i) and (ii) (B) of the Act.* Its order contained the usual cease and desist provisions and called for the posting of notices.

There is no dispute as to the basic facts:

MAT's unlicensed maritime employees are organized and represented by NMU. MAT is engaged in the transportation of bulk commodities by barge on the Mississippi River between docks at East Saint Louis, Illinois, and the fleeting or mooring area at Inver Grove, a few miles down river from Saint Paul, Minnesota. The cargo carried up river is coal destined for Northern States Power Company (NSP). The cargo carried down river is grain. The barges used in these operations are owned or chartered by MAT. They are moved by a towboat owned by MAT. See Mid-America Transp. Co. v. NLRB, 325 F.2d 87, 88 (7 Cir. 1963).

The towboat (which pushes rather than tows) has an operating complement of about 13 employees. One crew works for 30 consecutive days and then is off for the same length of time while another takes its place. When on duty, crew members at all times remain on the boat or the barges constituting its tow. They work 6-hour shifts. Their personal quarters are on the towboat. The oncoming crew reports at the downstream end. Its first duty is to tie off the barges which the towboat has brought down river. The crew then picks up and prepares the northbound tow. The 27 locks between Saint Louis and Saint Paul are so sized that they require the customary tow of 15 barges (5 in line and 3 abreast) to be split as they go through the locks. A crewman's time is divided about evenly between the towboat and the barges. His work on the barge consists, among other things, of fastening and unfastening cables; putting up the jackstaff flag; pumping; maintenance; inspecting and checking hatches, rigging and running lights; navigation; and particular duties when the boat and tow are passing under bridges or going through locks. Occasionally, a barge is dropped off at a dock along the way between East Saint Louis and the Inver Grove fleeting area; otherwise, the entire tow is taken to the fleeting area and tied off there. The towboat then picks up the southbound tow and returns to Saint Louis. The boat itself is in continuous operation and makes a round trip about every two weeks. It does not go above the fleeting area and no MAT employee remains with the barges after they are tied off there.

Farmers is engaged in the storage and merchandising of grain for about 150,-000 patrons in Montana, the Dakotas, and Minnesota. It owns a terminal at the foot of Chestnut Street on the Missippi River in downtown Saint Paul. It ships grain from the terminal mainly by barge but also by rail and truck. The barges for its grain are obtained from four or five different companies; about one-third of the grain it ships by barge goes in MAT barges. Most of this grain is destined for the Gulf of Mexico but MAT tows only to Saint Louis. Farmers

---

* § 158. Unfair labor practices * * *
 (b) It shall be an unfair labor practice for a labor organization or its agents—
 * * * * *
 (4) (i) * * * to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in * * * a refusal in the course of his employment * * * to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

* * * * *
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * * *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
 * * * * *

had a written agreement with MAT which provided, among other things, that MAT would furnish and Farmers would use 100 barges or more during the 1964 navigation season; that each "shall be chartered on a bare boat basis"; that Farmers was responsible for cleaning prior to loading of grain and for loading and unloading its cargo; and that MAT might move the barges by the use of other towing facilities.

NSP is a ' utility with plants in the Twin City area. It is under a long term contract to purchase coal from MAT's parent corporation. It has a separate contract with MAT for transportation of the coal. This obligates MAT to deliver to points which NSP designates. There are three of these points up river from the fleeting area. It is MAT's responsibility to see that the barges get to the designated docks. The MAT–NSP contract is silent as to who delivers the barges to the NSP docks. Actual delivery has been made by different towing companies other than MAT.

Twin City Barge & Towing Company (Towing) provides towing and harbor services in the Saint Paul area. Specifically, it moves barges, singly or by twos, from the fleeting area to the particular NSP dock which has been designated and, to this extent, fulfills MAT's obligation to NSP. On occasion it cleans barges for MAT. It makes up the southbound tows. It has been doing this work for MAT for six years. MAT is obligated to use Towing if the latter has a boat available unless MAT's customer has designated a different company.

Minnesota Harbor Service, Inc. (Harbor) is engaged at Saint Paul in the towing of barges and in their cleaning, repair and service. It has done some business with MAT since 1962 but did not clean barges for MAT until October 1964; prior to that time it cleaned MAT barges for Farmers and another.

There is no common ownership or control or common officers or directors as between MAT, Farmers, NSP, Towing or Harbor.

The fleeting area facility is owned by the Port Authority of the City of Saint Paul. It is leased to Towing for the use of its barge customers including MAT.

No MAT employee performed any service at the docks of Farmers or NSP. The examiner and the Board specifically found that "MAT did not engage in any activity, in the conduct of its day-to-day operations, above the fleeting area in 1964, and no MAT employees were so engaged in that period".

On August 1, 1964, NMU began a strike against MAT. That morning Collileux came to Farmers' dock in Saint Paul and distributed a pamphlet to five barge-loader employees of Farmers who were then at work there. The pamphlet referred to NMU's dispute with MAT and asked respect for its picket lines and support for its strike. Collileux was referred to the shop steward and to the president of the union which represented Farmers' employees. NMU vice-president Miller sent telegrams to that union's president and to Farmers' superintendent requesting assistance.

On that day two MAT barges were at Farmers' dock. Shortly after lunch Collileux began carrying a picket sign on public property near those barges. The sign stated that NMU was on strike against MAT and "We have no dispute with any other employer". No loading of the barges took place so long as Collileux picketed. On August 5 he returned when employees of Farmers were loading a MAT barge there. He appeared again around noon and at that time carried his picket sign for about two hours. The employees of Farmers stopped loading the barge. Farmers then notified its merchandisers that "they could not sell for delivery at a later date until such time as this matter is resolved." Farmers attempted to get barges from other sources but was not entirely successful. MAT offered to supply barges but this offer was not accepted by Farmers. As a result, Farmers "did miss a considerable volume of business".

Towing, whose deck employees are also members of NMU, encountered similar difficulties in August 1964. On August 11 one of its boats was on its way to pick up two MAT barges at Harbor's property in Saint Paul. A deckhand noted a picket on the shore with a sign identical to that carried by Collileux at Farmers. The captain notified his dispatcher and did not move the barges. On August 20 the same boat went to another terminal in the area to pick up a MAT barge loaded with grain. A deckhand noted a picket on the bluff and told the captain "they did not want to pick up the barge". On August 25 another boat was towing barges upstream from the fleeting area to an NSP plant. It was met by a small craft with a picket aboard. Collileux was the picket and asked the captain to tie the barges off. The captain called his dispatcher and then complied. Towing's president objected about this to NMU's Saint Louis agent. The latter replied that NMU was going to continue and even enlarge its picketing force.

About August 11 Collileux parked his car near the entrance to Harbor's property in Saint Paul with a sign reading "NMU on strike". However, no Harbor employee ceased work because of this.

There were no MAT towboats or MAT employees present at the scene of any of these several incidents.

The trial examiner and the Board found that the picketing was secondary; that the primary dispute was with MAT; that the situs of that dispute was between the East Saint Louis docks and the Inver Grove fleeting area; that MAT's day-to-day activities were confined to that situs; that MAT boats and employees did not engage in activity up river from the fleeting area; that Towing and Harbor were independent contractors; that neither they nor Farmers were engaged in the day-to-day activities of MAT; that NMU's appeals to employees of Farmers, Towing and Harbor and to the union representatives of Farmers' employees were addressed to individuals, within the meaning of the Act; and that this conduct of NMU and its agents violated the cited provisions of the Act.

The parties, for the most part, present the same cases in support of their respective positions. These cases, so far as they are helpful in the light of the language of the statute as it presently reads, reveal the following:

1. The observation is made that Congress consistently has refused to prohibit peaceful picketing "except where it is used as a means to achieve specific ends which experience has shown are undesirable". NLRB v. Fruit and Vegetable Packers, etc., 377 U.S. 58, 62, 84 S.Ct. 1063, 1066, 12 L.Ed.2d 129 (1964); NLRB v. Drivers, Chauffeurs etc., Union No. 639, 362 U.S. 274, 284, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960).

2. Congress, by § 8(b) (4), "did not seek * * * to interfere with the ordinary strike". NLRB v. International Rice Milling Co., 341 U.S. 665, 672, 71 S.Ct. 961, 965, 95 L.Ed. 1284 (1951).

3. A strictly literal interpretation, therefore, could not be given to that part of § 8(4) (b) which precedes the proviso in sub-section (B). If the section were literally interpreted, it would operate to ban primary activity. Local 761, Int'l Union of Elec., etc., Workers, AFL–CIO v. NLRB, 366 U.S. 667, 672, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

4. In enacting the statute Congress had the dual "objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own". NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951).

5. But not every type of secondary boycott is outlawed by the statute. Local 1976, United Bhd. of Carpenters, etc., v. NLRB 357 U.S. 93, 98–99, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

■ 6. The presence of economic pressure on a neutral employer is not necessarily evidence of illegality. Pressure of this kind may be the natural result of lawful primary activity, Indeed,

"The cases recognize the very practical fact that, intended or not, sought for or not, aimed for or not, employees of neutral employers ·do take action sympathetic with strikers and do put pressure on their own employers. * * * The question is the objective." Seafarers Int'l Union, etc., v. NLRB, 105 U.S.App.D.C. 211, 265 F. 2d 585, 590 (1959).

■ 7. The drawing of the line between what is legitimate "primary" activity and what is proscribed "secondary" activity can be difficult. Nevertheless, "the statute compels the task" and, "[I]n the absence of admissions by the union of an illegal intent, the nature of acts performed shows the intent". Local 761, Int'l Union of Elec., etc., Workers, AFL-CIO v. NLRB, supra, p. 674 of 366 U.S., p. 1290 of 81 S.Ct; Seafarers Int'l Union etc., v. NLRB, supra, p. 591 of 265 F.2d.

■ 8. Emphasis is on what is the routine activity of the primary employer and his "every day" or "normal" operations. Where these are involved, picketing, even though it results in an appeal to neutral employees, is usually not proscribed. See Local 761, Int'l Union of Elec., etc, Workers, AFL-CIO v. NLRB, supra, pp. 680–682 of 366 U.S., 81 S.Ct. 1285, Also,

"The primary strike, which is protected by the proviso, is aimed at applying economic pressure by halting the day-to-day operations of the struck employer. But Congress not only preserved the right to strike; it also saved 'primary picketing' from the secondary ban." United Steelworkers of America, AFL-CIO v. NLRB, 376 U.S. 492, 499, 84 S.Ct. 899, 904, 11 L. Ed.2d 863 (1964).

These two cases disclose that although the location of the picketing is an important factor, it still may not be decisive; they indicate that picketing is not protected merely because it is at the primary employer's property and that it is not proscribed merely because it is on property which, although "proximate" to that of the primary employer is not owned by the latter.

■ 9. Peaceful picketing at a secondary site has been held not proscribed where it is directed only to a struck product, as contrasted with being directed against all trading with the secondary employer. NLRB v. Fruit and Vegetable Packers, etc., supra, pp. 63 and 70–71 of 377 U.S., 84 S.Ct. 1063, NLRB v. Upholsterers Frame and Bedding Workers, 331 F.2d 561 (8 Cir. 1964).

■ 10. A strike situs may be ambulatory. A ship is an example. Seafarers Int'l Union, etc. v. NLRB, supra, p. 590 of 265 F.2d; Sailors' Union of the Pacific (Moore Dry Dock Co.), 92 N.L. R.B. 547, 549 (1950).

■ 11. In certain circumstances, "the presence or absence of employees of the primary employer on the premises is not a critical factor in the legality of the picket line". Seafarers Int'l Union, etc. v. NLRB, supra, p. 590 of 265 F.2d. See Local 618, Automotive, etc., Employees Union, AFL-CIO v. NLRB, 249 F.2d 332 (8 Cir. 1957); Milwaukee Plywood Co. v. NLRB, 285 F.2d 325, 328 (7 Cir. 1960); New Power Wire & Elec. Corp. v. NLRB, 340 F.2d 71, 74 (2 Cir. 1965).

As in the Steelworkers case, supra, p. 496 of 376 U.S., 84 S.Ct. 899, it is clear that NMU's activities here fell within the strict language of clauses (i) and (ii) of § 8(4)(b); that NMU's objective, as judged by its actions, was to induce Farmers, Towing, and Harbor to cease handling or loading MAT barges during the pendency of the strike; and that that objective also is within the language of sub-section (B), exclusive of that subsection's proviso. The question, then, is whether NMU's activities are within the area of primary picketing protected by that proviso.

NMU emphasizes that its picketing was peaceful at all times and that Collileux

was its only Minnesota picket. It argues that the barges—not the river from East Saint Louis to Inver Grove and not the MAT towboat alone—were the employment situs; that the work done by Towing was clearly necessary to the day-to-day operations of Mat; that Towing was no more than a subcontractor of MAT and was doing work which MAT was contractually obligated to perform for NSP; that the delivery of the barges was just as important to MAT's day-to-day operations as was the delivery of railroad cars in the Steelworkers case; that the railroad cars there were not even the property of the primary employer, whereas the barges here were the property of MAT; that the subcontracting does not deprive NMU of its right to picket any more than it did in the Electrical Workers case; that the handling of other employers' barges was not interrupted; that the economic impact was no greater than if the towboat had stopped operating; that the cleaning and loading of barges, even though done by neutral employees, is essential to MAT's day-to-day operations and are a part of those operations; that the work done by Farmers and Harbor is analogous to that of truckers making deliveries to a plant; that the cleaning and loading of barges is more closely related to day-to-day operations than is the overhauling involved in the Seafarers case; and that the barges are comparable to the cargo holds of a seagoing vessel except that they can be disconnected and left at the dock while the towboat itself moves on.

There is a certain appeal to this rationale but we are not persuaded by it.

The concept of what is necessary to the day-to-day operations of MAT must have its limitations, too. Fuel, for example, is necessary in the operation of MAT's towboat. Picketing the towboat might well effect economic pressure on any fuel supplier whose delivering employees refuse to cross the picket line. That picketing, by the cases cited, would be legal primary picketing. However, if NMU were to picket the supplier's Kentucky coal mine or its Oklahoma re-

finery, that picketing, by the same cases, would be proscribed. Yet both situations concern the fuel which is necessary to MAT's daily operations. The distinction lies in the situs.

 The barges here were owned or chartered by MAT. But we are not persuaded that their wanderings and use up river from the fleeting area were part of MAT's operations, any more than that their wanderings and use down river below East Saint Louis on their way to the Gulf were, for strike purposes, operations of MAT. The significant thrust of the Electrical Workers and Steelworkers cases is in the vital connection of the workers affected with the day-to-day operations of the struck employer. This is emphasized by Mr. Justice White in his opinion in the Steelworkers case, pp. 497–98 of 376 U.S., 84 S.Ct. 899. Of course, in one sense, the unloading, cleaning and reloading of its barge are operations relating to MAT's business activity and essential to its business. Presumably, were the barges picketed while they were tied at MAT's East Saint Louis docks, there would be little question as to the propriety of that picketing. On the other hand, were picketing to go on in New Orleans while MAT barges were being unloaded there at a neutral dock by employees of a consignee after those barges had been towed down river from East Saint Louis by a transportation company other than MAT, that picketing would not be proper.

The present case may perhaps fall between these two extremes for, as NMU points out, MAT was contractually obligated to effect delivery of the coal laden barges to designated NSP docks above the fleeting area, and to tow grain laden barges down river from Inver Grove. We think, however, that this additional fact of contractual obligation does not swing the case in NMU's favor. It is clearly established that MAT's towboat did no towing above the fleeting area and that MAT's crew left the barges there and performed no service of any kind upriver. Towing's and Harbor's and Farmers' uses of the barges were

not occasioned by the strike but were their regular and normal business activities. The barges' status as an employment situs, if it was such on the trip up-river, ceased when MAT's transportation ended at Inver Grove. This is not a situation of the primary employees' mere absence from their jobsite, such as the court was concerned with in the Seafarers Union case. Instead, the barges had ceased to be the jobsite before Collileux' picketing took place. They had then become, instead, the normal jobsites of secondary employees alone and the picketing was directed to and affected their normal work at such normal sites without the accompaniment or even proximateness of primary status. Every MAT employee was far removed from the picketing.

The Board suggests an analogy which strikes us as a valid one. It is that of a trucking firm which interlines freight and turns over the loaded trailer it owns and has hauled to another trucking company which, in turn, transports the trailer to its ultimate destination. Seemingly, where a union is in a dispute with the originating carrier, its effort to induce employees of the connecting carrier to refuse to handle the trailer is prohibited. See NLRB v. Highway Truckdrivers, 300 F.2d 317 (3 Cir. 1962); Teamsters Union (Wilson Teaming Co.), 140 N.L.R.B. 164. Cf. Brown Transp. Corp. v. NLRB, 334 F.2d 30 (5 Cir. 1964).

NMU would distinguish the trucking operation from the present barge or maritime one on the ground that the barges are independent vehicles and "are the very reason for the deckhand's employment", whereas the truckdriver's duties with respect to the trailer are so few as to be de minimis. We fail to see the distinction. But if one exists, the relationship between the deckhand and the barge ceases once the barge is tied off from the towboat and routinely pursues its upriver way under the power of an independant and neutral employer.

Perhaps we should say by way of final clarification that we do not interpret the trial examiner's and the Board's state-

ment that the work situs was the river between East Saint Louis and Inver Grove as meaning precisely that. We assume that what they meant to say is that the employment situs was the towboat and the towed barges during the time the employees worked on them as they plied between the terminals.

Our conclusion makes it unnecessary for us to consider what significance, if any, lies in the "bare boat" reference in the MAT-Farmers agreement.

NMU's petition is denied. Enforcement of the Board's order is granted.