195 F.Supp. 458 (1961)
John A. PENELLO, Regional Director of the Fifth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL UNION NO. 59, SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, AFL-CIO, Respondent.
Civ. A. No. 2336.
United States District Court D. Delaware.
June 21, 1961.
*459 *460 Jerome L. Avedon, Atty., Julius G. Serot, Deputy Asst. Gen. Counsel, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, Joseph I. Nachman, Supervising Trial Atty., Washington, D. C., David C. Sachs, Regional Atty., Region 5, Baltimore, Md., were on the brief), for National Labor Relations Board.
Joseph Donald Craven, Wilmington, Del., for respondent.
John F. Lawless, Wilmington, Del. (Gerard D. Reilly, Washington, D. C., was on the brief), for E. I. du Pont de Nemours and Co., the charging party.
CALEB M. WRIGHT, Chief Judge.
This case arises on a petition by the Regional Director of the Fifth Region of the National Labor Relations Board for injunctive relief under § 10(l) of the National Labor Relations Act, as amended.[1] The petition alleges that respondent Local 59 has engaged in, and is engaging in, acts and conduct in violation of § 8(b) (4) (i) and (ii) (D).[2] A hearing was held before this Court on May 29, 1961, and, at the close of petitioner's case, respondent moved to dismiss the petition. This is a ruling upon that motion.
Although there is little dispute between the parties as to the material facts, the importance of the legal questions involved warrants an extended discussion of the factual background of this case.
The charging party, E. I. du Pont de Nemours and Company (Du Pont), is engaged in the manufacture of chemicals and related products. The present dispute concerns a program of expansion undertaken by Du Pont at its Seaford, Delaware, Nylon Plant. The expansion consists of two phases, one of which involves modernization of existing facilities and another which concerns construction of a new plant.[3] The testimony, although somewhat conflicting among Du Pont employees themselves, was to the effect that the hiring of employees or the sub-contracting of particular work is generally done for the whole operation rather than for each separate phase.[4] The present expansion program began in August, 1959, and is scheduled to be completed by mid-1962.[5]
Du Pont has no fixed policy in determining who will perform particular tasks in construction or expansion projects such as this. The work might be performed by permanent employees on the Du Pont payroll, it might be assigned to the construction division of the company which could hire other employees directly, or it might be sub-contracted. The key factors in the determination in each case are economic, in the broadest sense of the term.[6] In large projects, however, Du Pont prefers to take advantage of union hiring facilities.[7] About 50% of the *461 Seaford operation has been sub-contracted, the rest being handled by Du Pont's construction division.[8]
There are approximately 6,300 man days of sheet metal work involved in the Seaford expansion project.[9] Since August, 1959, about 1,300-1,500 man days of the total have been accomplished, all on the modernization of existing facilities.[10] No sheet metal work has begun on the new construction.[11] Within the next year or so, it is anticipated, therefore, that approximately 5,000 man days of sheet metal work must be performed. Du Pont has, for the last two to two and one-half years employed workers classified as millwrights and ironworkers for this type of work.[12] These employees, who do not belong to Local 59, apparently live in the downstate area of Delaware near Seaford and have been employed through a union hiring hall.[13]
The evidence further shows Sweeney, respondent Local 59's Business Agent, knew for some two years that sheet metal work was being performed at Seaford by employees who were not members of his organization but made no protest.[14] Local 59's members live in the Wilmington, or upstate, area of Delaware.[15] He was, therefore, not interested in what he termed "incidental" sheet metal work.[16] But he was very much interested in the large volume of sheet metal work coming up.[17] Early this year Sweeney approached Trumpore, Du Pont's project manager at Seaford, and inquired several times as to the status of the sheet metal work.[18] Sweeney stated he had to do something to get his men on the job, and asked when there would be sheet metal work in volume. In mid-April, Trumpore told Sweeney this would occur in a month or so.[19] Trumpore, however, had no authority to change the manner in which the work was being done or to establish terms and conditions of employment for employees.[20]
Although respondent desires the Seaford sheet metal work, its members will not work for Du Pont directly, for as a matter of policy, Local 59, which has not been certified by the NLRB as the representative of any of Du Pont's employees,[21] will supply labor only to those in contractual relations with it.[22] Du Pont refuses to sign such a contract.[23] In order to satisfy respondent, therefore, Du Pont would have to sub-contract all or part of the sheet metal work to a contractor in signed relations with Local 59.[24] This has not been a barrier in the past, however, for Du Pont has often sub-contracted such work in the Wilmington area to union contractors[25] and has done so at least once in connection with work at Seaford.[26]
The dispute in this case results from the provisions of Local 59's collective agreement with the sheet metal contractors. Because respondent's members live in the Wilmington area, the agreement provides work in that area will be performed with little or no travel pay. Work in the Seaford area, however, must be compensated not only by the usual wage but also by $10 per day travel *462 pay.[27] This extra cost must ultimately be borne by Du Pont, should a union contractor get the work. This would be particularly true if a "fixed fee" contract was employed. This arrangement provides that Du Pont will pay the sub-contractor's costs and establishes a fixed fee to be paid over these costs.[28] For practical purposes, therefore, it is Du Pont, rather than the sub-contractors, which determines whether and on what terms and conditions Local 59 will work on its projects.
For this reason, negotiations between Local 59 and certain Du Pont officials were undertaken on Sweeney's initiative.[29] The principal stumbling block was the $10 travel requirement. One Du Pont official told Sweeney that Local 59 would get the work if the travel pay issue was straightened out.[30] Another indicated that if the union's demands for travel pay were reduced to $5, the sheet metal work would probably be sub-contracted to an employer in signed relations with Local 59.[31] In any case, Du Pont conducted these negotiations in a manner so as to create in Sweeney's, and thereby the union's mind the impression that the only barrier to Local 59's receiving the work was the $10 travel pay demand. Although witnesses for Du Pont were somewhat equivocal on this point, no other reason appears in the record.[32]
Local 59 and Du Pont failed to agree on this issue. On May 3, 1961, Local 59 began to picket the site of Du Pont's Seaford operations.[33] The picketing later spread to other Du Pont facilities throughout the state.[34] As a result, the employees of certain sub-contractors at the Seaford construction site have refused to cross the picket line, and 70% of the job has been shut down.[35] Among those refusing to work are some iron-workers who had been performing sheet metal work for Du Pont.[36] At other Du Pont operations, there have also been some refusals to cross the picket lines.
On May 10, Du Pont filed a charge with the NLRB alleging that the aforesaid conduct of Local 59 was in violation of § 8(b) (4) (i) and (ii) (D). On May 22, the Regional Director filed the petition presently before the Court.
There is no evidence in the record upon which this Court can base a finding that Du Pont's motivation for not assigning the sheet metal work to Local 59 was other than economic. All parties are in agreement that no other labor organization, trade, craft, or class of employees has made a claim for this work or has threatened to take retaliatory action against Du Pont should all or some of the sheet metal work at Seaford be subcontracted to a contractor in signed relations with Local 59. Indeed, it appears from the record that at least some of those presently doing this work have cooperated with respondent against Du Pont by refusing to cross Local 59's picket line.[37]This is not a dispute between *463 rival groups of employees but solely a dispute between Du Pont and respondent. The sole question before the Court is whether, on these facts, there is reasonable cause to believe the union's peaceful picketing in furtherance of its demands is prohibited by § 8(b) (4) (i) and (ii) (D) (hereinafter § 8(b) (4) (D)).
That section reads as follows:
"§ 8(b) It shall be an unfair labor practice for a labor organization or its agents 
* * * * * *
"(4) (i) to engage in, or to induce or encourage any individual employed by any person * * * to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person * * *, where in either case an object thereof is 
* * * * * *
"(D) forcing or requiring any employer to assign particular work to employees in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work."
The language of this section is extremely broad, even though Congress continually referred to it as a ban on jurisdictional disputes in which rival groups of employees use economic coercion against each other with the employer trapped in the middle.[38] It would seem on its face to render illegal any coercive economic activity designed to force an employer to assign work to one group of employees rather than to another. It would in effect create a broad employer prerogative to assign work to whomsoever he chose free of economic pressure brought to bear by any other employee group.[39] This prerogative would, moreover, be protected by the law even if all employee groups involved had agreed among themselves as to which should have the work. A fortiori, the fact that competing claims for the work have not been made by rival groups of employees would be of no significance. Were the naked language of § 8(b) (4) (D) the only guidepost for the Court, there could be little question about the result in this case.
But § 8(b) (4) (D) does not stand alone in the statutory scheme, for in § 10(k)[40] Congress provided:
"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 8(b), the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."
It should be noted first that § 10(k) comes into play "whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (D) of section 8(b) * * *." (Emphasis supplied.) On the face of the statute, therefore, it appears that § 10(k) is an integral and indispensable part of the congressional policy expressed in § 8(b) (4) (D) and that both sections must be interpreted as *464 an harmonious scheme.[41] If particular conduct is within the proscription of § 8(b) (4) (D), it must present a "dispute" cognizable by the Board in a § 10 (k) hearing. Conversely, if there is no "dispute" which can be "determined" by the Board under § 10(k) there can be no conduct prohibited by § 8(b) (4) (D). The Supreme Court has held, moreover, that enforcement of Board orders under § 8(b) (4) (D) will be denied absent a valid determination of the "dispute" under § 10(k). N. L. R. B. v. Radio and Television Broadcast Engineers Union, Local 1212, 1961, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302. (Hereinafter referred to as Radio and Television Engineers.)
But the central problem here is that although these provisions must be construed in harmony, they have wholly conflicting implications and seem even totally unrelated in some respects. First, the provisions of § 10(k) are keyed to the word "dispute" which is used five times in that section. By itself, this word indicates that an active controversy between two or more parties is to be the subject of the § 10(k) hearing. Section 8(b) (4) (D), on the other hand, makes no such reference. In view of the congressional preoccupation with jurisdictional disputes in the passage of these sections, however, a fair reading of § 10 (k) would seem to indicate that the "dispute" to be "determined" is one between rival groups of employees over which is entitled to "particular work". The language of § 10(k) also provides for the dismissal of unfair labor practice charges if, within 10 days after receiving notice of the charge, the "parties" make a "voluntary adjustment, of the dispute." This would seem to imply even more clearly that the rival groups of employees must assert competing claims for the same work and there must be in existence at the time of the filing of the § 8(b) (4) (D) charge a present and active controversy between these groups. If no group resists or opposes another's claim to particular work, there is no "dispute" to be voluntarily adjusted, unless it be the very active dispute between the group claiming the work and the resisting employer. But neither petitioner nor the charging party contends § 10(k) authorizes substantive Board determinations of disputes between unions and employers.
Section 8(b) (4) (D) and § 10(k), therefore, seem wholly inconsistent. Section 8(b) (4) (D) appears on its face to be a broad grant of power over work assignments to employers. Section 10 (k) ostensibly provides for compulsory NLRB determination of jurisdictional disputes between competing groups of employees and unfair labor practice sanctions only after voluntary means of adjustment have failed. But this interpretation of § 10(k) would necessarily lead to the conclusion that § 8(b) (4) (D) is far narrower than it appears, for it purports to proscribe much conduct not involving a "dispute" cognizable under § 10(k). To give § 8(b) (4) (D) its literal scope would, on the other hand, necessarily disregard the apparent meaning of § 10(k).
The NLRB has, since the passage of the Act, construed § 8(b) (4) (D) to mean "that an employer is free to make work assignments without being subject to strike pressure by a labor organization seeking the work for its members. * * *" Local 472, International Laborers' Union, 123 N.L.R.B. 1776, 1781 (1959). This literal application of § 8(b) (4) (D) necessarily resulted in a substantive interpretation of § 10(k) not in accord with its apparent meaning. Because the Board read § 8(b) (4) (D) to be a broad grant of prerogatives to employers, the § 10(k) hearing was treated simply as a procedure designed to uphold these rights. The Board would determine merely whether the picketing union was entitled to the work under a Board order, certification, or a collective agreement *465 with the employer.[42] If not, the Board, declining to make an affirmative award of the work between the employees involved or to consider other criteria such as the employer's prior practices, custom in the industry, and the like, would simply hold the picketing union was not entitled to the work.[43] After this perfunctory "determination" under § 10(k), the employer was free to change his mind and reassign the work, at all times protected from union retaliation by the broad language of § 8(b) (4) (D). Needless to say, assertion of competing claims by rival groups of employees was unnecessary for an unfair labor practice determination under § 8(b) (4) (D) or the performance of what the Board regarded as its function under § 10(k), since the emphasis upon the employer's prerogatives over work assignments rendered such a factor irrelevant.[44]
Because unfair labor practice sanctions under § 8(b) (4) (D) are not available unless the Board has made a valid determination under § 10(k) unfavorable to the accused union, the legal challenge to Board dogma derived from the literal language of § 8(b) (4) (D) was necessarily directed against its perfunctory interpretation of § 10(k). Three Courts of Appeals rejected the Board's reading of that section[45] while one upheld it.[46] In the Radio and Television Engineers decision, supra, the Supreme Court had occasion to pass upon the question and conclusively repudiated the Board's narrow interpretation of § 10(k). This Court finds the Supreme Court's reading of § 10(k) and its determination of that section's underlying policies compels the conclusion that § 8(b) (4) (D) proscribes coercive economic activity only when it is employed as a means of resolving an active dispute between rival groups of employees which have asserted competing claims for particular work.
The Radio and Television Engineers case involved a dispute between two unions over which was entitled to particular work. The employer assigned it to one, and the other struck, the employer filing a § 8(b) (4) (D) charge against the latter with the NLRB. The Board, finding in a § 10(k) proceeding that the striking union was not entitled to the work under a Board order or certification or a collective agreement with the employer, sustained the charge. Enforcement of the Board order was denied by the Second Circuit, 272 F.2d 713, the Supreme Court affirming.
The Supreme Court commented first that if § 8(b) (4) (D) "stood alone", the respondent union's conduct would be sufficient to support the charge.[47] It noted, however, Congress had added § 10(k) to the Act and held "that under that section it is the Board's responsibility and duty to decide which of two or more employee groups claiming the right to perform certain work tasks is right * * *."[48]
As to the meaning of the word "dispute" in § 10(k), it stated:
"* * * The words `hear and determine the dispute' convey not *466 only the idea of hearing but also the idea of deciding a controversy. And the clause `the dispute out of which such unfair labor practice shall have arisen' can have no other meaning except a jurisdictional dispute under § 8(b) (4) (D) which is a dispute between two or more groups of employees over which is entitled to do certain work for an employer."[49]
If, then, § 10(k) establishes a procedure under which the NLRB must decide on its merits a dispute between two groups of employees and which is mandatory in all § 8(b) (4) (D) cases, § 8(b) (4) (D) can hardly be said to proscribe conduct which, as here, does not involve such a dispute.
Moreover, the Supreme Court noted:
"Section 10(k) * * * quite plainly emphasizes the belief of Congress that it is more important to industrial peace that jurisdictional disputes be settled permanently than it is that unfair labor practice sanctions for jurisdictional strikes be imposed upon unions. Accordingly, § 10(k) offers strong inducements to quarrelling unions to settle their differences by directing dismissal of unfair labor practice charges upon voluntary adjustment of jurisdictional disputes. And even where no voluntary adjustment is made, `the Board is empowered and directed,' by § 10(k), `to hear and determine the dispute out of which such unfair labor practice shall have arisen,' and upon compliance by the disputants with the Board's decision the unfair labor practice charges must be dismissed."[50]
Petitioner would have the Court ignore this policy of § 10(k), however, for his theory apparently is that no agreement between the groups of employees involved can stay the operation of § 8(b) (4) (D) so long as the employer does not agree.[51] But this argument proves too much, for not only does the Supreme Court view the policies of § 10(k) as directed towards inducing voluntary settlement between the groups of employees involved but also the language of that section would seem to compel it. Otherwise, the Board would, under § 10(k), be forced to decide on their merits disputes solely between unions and employers.[52]
Petitioner's theory would lead to yet another dilemma. Du Pont has hired non-members of Local 59 principally because of Local 59's demand for travel pay. *467 Were the NLRB now to determine that Local 59 is entitled to the work, what will Du Pont then be able to do? Petitioner asserts that it can do anything it wants to, for it will not be bound by the § 10(k) determination.[53] Petitioner claims Du Pont's rights will be "affected only to the extent that respondent's picketing * * * would no longer be subject to restraint under the Act."[54]
There are two things wrong with this theory. First, if the NLRB determines Local 59 should have the work, then the only dispute now in existence will still be present even though the "dispute" was supposed to be "determined" in the § 10 (k) proceeding. The disruption of commerce will continue unabated. Section 10(k), in that situation, settles nothing. Obviously, § 10(k) is not meaningful unless designed to come to the employer's rescue only when he is caught between competing forces and is "between the devil and the deep blue."[55]
The second defect in petitioner's theory is that it does not comply with the Supreme Court's ruling in the Radio and Television Engineers case. The Board explicitly argued there that the § 10(k) determination was not intended to be compulsory. Mr. Justice Black, answering for a unanimous Court, said, "We find this argument unpersuasive, to say the very least."[56] One argument advanced by the Board to justify its interpretation was that the lack of explicit standards indicated the employer's assignment (whatever it might be at the time) should be decisive.[57] The Supreme Court answered:
"* * * The result [of a jurisdictional dispute] is that the employer has been placed in a situation where he finds it impossible to secure the benefits of stability * * *, not because he refuses to satisfy the unions, but because the situation is such that he cannot satisfy them. Thus, it is the employer here, probably more than anyone else, who has been and will be damaged by a failure of the Board to make the binding decision that the employer has not been able to make. We therefore are not impressed by the Board's solicitude for the employer's right to do that which he has not been, and most likely will not be, able to do."[58]
This determination is clearly in line with the policy of § 10(k). So long as the employer is free to ignore the § 10(k) determination, rival groups of employees will have great incentive to discover other and more subtle forms of pressure to exert upon him in order to persuade him to change his views. The jurisdictional dispute, then, will not have been terminated or settled in any way but merely channelled into other streams of coercive action. The Supreme Court, in rejecting the contention now pressed before this Court, noted, "[T]he rival unions, short of striking, would still be free to adopt other forms of pressure upon the employer."[59]
If § 10(k) applies to situations not involving disputes between rival *468 groups of employees, therefore, it may deprive the employer of his right to hire and to seek the best economic bargain subject to economic pressure by unions.[60] For if, as petitioner contends, the NLRB may assign work when only one group claims it but the employer prefers another, the employer may, after a § 10(k) determination in which his choice is not decisive, be in a far worse position than when the only impediment to the exercise of his right to hire is economic pressure brought to bear by a union. Petitioner has not pointed to the slightest shred of legislative history to support his rather peculiar interpretation of § 10(k), nor has the independent research of the Court found any. Indeed, the legislative history is clearly contrary to petitioner's contention and indicates that the Board is to determine whom the employer must hire only when the employer himself is trapped between competing forces.[61]
Petitioner cites International Longshoremen's and Warehousemen's Union v. Juneau Spruce Corp., 1952, 342 U.S. 237, 72 S.Ct. 235, 240, 96 L.Ed. 275, as controlling here.[62] That case arose under § 303(a) (4) of the Act, a provision employing the language of § 8(b) (4) (D).[63] The Supreme Court said there, "The fact that the union of mill employees temporarily acceded to the claim of the outside group did not withdraw the dispute from the category of jurisdictional disputes condemned by § 303(a) (4)."[64] This language is inconclusive at best, for it merely says the mill employees did not dispute the longshoremen's claim "temporarily". Moreover, Juneau Spruce, decided prior to Radio and Television Engineers, arose under § 303(a) (4) and apparently was based on the theory that the employer's assignment was decisive. It was, therefore, an important precedent argued before the Supreme Court in the Radio and Television Engineers case. The Court, however, did not consider it controlling and disposed of it simply by saying a "substantive symmetry" between the two approaches to jurisdictional disputes is not required.[65] It further stated the effect of a § 10(k) determination upon an action under § 303(a) (4) was an open question not presented in the case. In view of some of the language in Juneau Spruce indicating a § 10(k) determination would have no effect on § 303 actions,[66] the vitality of that latter decision may now be open to question.
*469 Nor is the legislative history of the Act of aid to petitioner, for it definitively shows that Congress intended § 8(b) (4) (D) to reach economic coercion only when used to resolve disputes between competing groups of employees. H.R. 3020, as reported from committee and passed by the House, contained language which did not differ in relevant substance from the present subparagraph (D) of § 8(b) (4) and which was explicitly titled as the definition of a jurisdictional dispute.[67] The House Report, in speaking of this provision, stated, "Jurisdictional strikes usually involve quarrels, not between employers and employees, but between rival unions, which use the strike weapon against each other, and they partake of the nature of some forms of illegal boycotts."[68] In the House debates on the proposed measure, Representative Landis said, "A jurisdictional dispute is one growing out of a dispute betwen two or more representatives of employees. Innocent employers should not be penalized because unions force a strike to settle difficulties between unions."[69] Representative Hartley, in describing the measure, explained the jurisdictional dispute provision through the medium of an example, that being a dispute between the carpenters and the laborers as to which would carry lumber from the trucks to the job.[70] In the Senate-House conference, § 8(b) (4) (D) was adopted along with § 10(k). The House Conference Report stated, "The Senate amendment also contained a new section 10(k), which had no counterpart in the House bill. This section would empower and direct the Board to hear and determine disputes between unions giving rise to unfair labor practices under section 8(b) (4) (D) (jurisdictional strikes)."[71] (Emphasis supplied.) It appears, therefore, the House neither thought nor intended that § 8(b) (4) (D) proscribe conduct not involving disputes between rival groups of employees.
The same proposition is applicable to the Senate. The original measure in the Senate, S. 1126, contained language similar to the present § 8(b) (4) (D) except for the omission of the words "a particular trade, craft, or class."[72] Section 10(k) was also in the bill. The Senate debates clearly indicate that § 8(b) (4) (D) was intended to reach only jurisdictional disputes in the normal sense. Senator Morse, the author of § 10(k) put an extensive memorandum in the Record on the subject. It began by stating that the term "jurisdictional disputes" had been used very loosely to cover a great variety of situations "that have as their common ingredient a controversy between two or more labor unions."[73] Senator Taft, in what he described as a "comprehensive statement"[74] on the committee bill, said, "The fourth type of unfair labor practice is the ordinary jurisdictional *470 strike, in which two unions compete for work on a particular job."[75]
Petitioner concedes the original bills were intended only to reach "classical" jurisdictional disputes but contends the addition of the words "a particular trade, craft or class" broadened this purpose.[76] To support this, he relies on the following statement of Senator Taft after the Conference Committee added those words:
"It is contended that the addition of the condition `another trade, craft, or class' has transformed this subsection into what started to be a prohibition of jurisdictional strikes into a prohibition preventing one union from striking even though no other union was in the picture. I have no hesitation in saying that this subsection applies not only to strikes over the assignment of particular work to one union rather than another, but also to the assignment of work to one union rather than another group of employees. It is submitted, however, that this is not a proper criticism of this section since under the Labor Relations Act at the present time an employer would be violating subsection 8(3) if he discharged or discriminated against some employees merely to provide work to members of a union. Under existing law, employers have no right to accede to such union demands unless there is a closed or union-shop agreement in effect. If an employer discriminates in the assignment of work so as to encourage a non-union group by assigning them work which properly should be performed by union employees, it would be an unfair labor practice under the provisions of existing law and the conference bill. In other words all that this amendment to the Senate bill does is to make it illegal for unions to coerce employers into doing something which an employer is already prevented from doing by the operation of section 8(3) of the present Wagner Act."[77]
It should be noted at the outset that the House bill always contained the words "a particular trade, craft, or class", and yet everyone believed it applied only to "classical" jurisdictional disputes. Secondly, the portion of § 8(b) (4) (D) which lends itself to a broad interpretation is "forcing or requiring any employer to assign particular work" rather than the words "particular trade, craft, or class."
Moreover, Senator Taft, in the statement above, does not say what petitioner seems to think he is saying.[78] To be sure, he used the word "assignment", but that is taken directly from the statute and is of no aid in construing that statute. In effect, the Senator said merely that while the pre-conference § 8(b) (4) (D) reached only disputes between unions, the Act had been broadened to encompass disputes between union and non-union groups.
Petitioner argues, however, that this additional language must mean more, for it is unrealistic to think that unorganized groups would ever resist hiring demands by a union made to their employer.[79] *471 Perhaps in many instances they would not, but men about to lose their jobs can cause a great deal of trouble and might, in some cases, be fully able to place an employer in an impossible situation identical to that when a jurisdictional dispute between unions occurs. The fact that Congress added language to a statute so as to encompass unusual situations is hardly cause to strain the legislative history and the language itself to reach everyday occurrences.
A further reason for denying the petition is apparent. Section 13 of the Act, 29 U.S.C.A. § 163 provides in substance that the Taft-Hartley Act shall not be taken as restricting or expanding either the right to strike or the limitations on that right existing when the Act was passed, unless "specifically provided for" in the Act itself. The picketing here was not proscribed prior to 1947.[80] In such a situation, "§ 13 declares a rule of construction which cautions against an expansive reading of [§ 8(b) (4) (D)] which would adversely affect the right to strike, unless the congressional purpose to give it that meaning persuasively appears either from the structure or history of the statute. Therefore, § 13 is a command of Congress to the courts to resolve doubts and ambiguities in favor of an interpretation of [§ 8(b) (4) (D)] which safeguards the right to strike as understood prior to the passage of the Taft-Hartley Act." N. L. R. B. v. Drivers, Chauffeurs, Helpers Local Union No. 639, 1960, 362 U.S. 274, 282, 80 S.Ct. 706, 711, 4 L.Ed.2d 710.[81] Even without such a rule of construction, the Court is of the opinion the petition should be denied. With it, there can be no doubt.
Whether the conduct of Local 59 here violates provisions of the Act other than § 8(b) (4) (D) is not an issue before the Court in this proceeding, and nothing in this opinion should be construed as an indication that the conduct is either protected or prohibited by other provisions.
The NLRB, as well as this Court, is bound by decisions of the United States Supreme Court. Radio and Television Engineers stands for the proposition that effect should be given to the plain language and positive history of § 10(k). This cannot be done without tempering the broad proscriptions of § 8(b) (4) (D).
If there is no dispute between rival groups of employees, there is nothing for the Board to "determine" under § 10(k). Absent such a dispute, the voluntary adjustment provisions are rendered meaningless. Moreover, for all that appears in this record, some of the unionized workers who were doing the sheet metal work have cooperated with respondent in refusing to cross the picket line, and their union does not even care to be a party to the § 10(k) proceeding. The only dispute is between Du Pont and Local 59. Picketing in such a situation is not proscribed by § 8(b) (4) (D) because it does not involve a dispute between rival groups of employees over particular work.[82]
This Court is aware that its function in this proceeding is not to resolve conflicts in testimony or to make an ultimate determination as to whether *472 an unfair labor practice has been committed. Penello v. Wilmington Bldg. and Const. Trades Council, D.C.D.Del.1959, 177 F.Supp. 413. Rather, § 10(l) requires merely that it find only that petitioner has reasonable cause to believe that an unfair labor practice has been committed and the relief sought is appropriate. It is clear, however, that judicial relief does not automatically follow upon the filing of a § 10(l) petition. Alpert v. United Steelworkers of America, D.C.D.Mass.1956, 141 F.Supp. 447.
"What a court must do is to appraise the whole situation, exercising the best judgment it can as to what is the general scope of the facts likely to be proved before the Board, what are the issues of law, and how clear it is what rule of law would be and should be applied by the Board." Id. at page 450.
That the judicial function is to be exercised in § 10(l) cases appears plainly enough on the face of that section, for the respondent is given an absolute right to present oral testimony on his behalf. That function, however, is limited to the extent that appropriate relief will issue upon a showing by petitioner of credible evidence constituting a prima facie case. Alpert v. Truck Drivers, Warehousemen and Helpers Local No. 340, D.C.D.Me. 1958, 161 F.Supp. 86. Petitioner must also present a legal theory or theories based upon appropriate provisions of the Act to support his finding. Douds v. Metropolitan Federation of Architects, Engineers, Chemists and Technicians, Local 231, D.C.S.D.N.Y.1948, 75 F.Supp. 672. The court need not be fully convinced of its worthiness but need find only that it is reasonable and might be upheld by the NLRB and enforced by appellate tribunals.
In evaluating petitioner's legal theories a court has several guideposts. Among these are the language of the statute, relevant judicial interpretations, relevant NLRB decisions, and the legislative history of the Act. In the present case, there is a standoff on the language of the Act, for while § 8(b) (4) (D) justifies the relief requested, § 10(k), an integral part of the statutory scheme, looks in the other direction. Were this the end of the Court's responsibility, the bare bone of § 8(b) (4) (D) would be enough.
But, as explained at length in the body of this opinion, the decision in Radio and Television Engineers is a new and critical factor, for neither the Board nor this Court can afford to be lax in complying with precedents from the highest court. Petitioner's legal theories must be within the residuum of Board discretion left by the holding and reasoning of the Radio and Television Engineers decision. To be sure, a court in a § 10(l) proceeding cannot lean too heavily upon dicta incidental to the main issues determined in a Supreme Court decision. On the other hand, it cannot ignore the reasoning and theory of such an opinion, for it cannot be presumed, especially when dealing with a recent decision, that the high court wrote at length on a subject but intended that lower courts read only the words "affirmed" or "reversed". Opinions are written because one set of facts is rarely identical to another, and unless decisions are explained and the reasoning of appellate tribunals made clear, there can be no system of precedents. Petitioner's legal theories in this case are inconsistent with both the holding and reasoning of the Radio and Television Engineers decision. As such, they do not justify § 10(l) relief.
As for relevant post-Radio and Television Engineers NLRB decisions, there apparently are none. This, of course, puts petitioner and this Court in a difficult position, but it cannot make petitioner's case stronger. Petitioner has made remarks to the effect that uncertainty in the law justifies § 10(l) relief.[83] *473 To be sure, had petitioner presented legal theories reasonable but uncertain when tested by appropriate standards, relief would have been granted. But simply saying the law is uncertain is a quite different matter. Petitioner must have reasonable cause to believe Local 59 is engaging in an unfair labor practice, not reasonable cause to believe it might be. Otherwise, petitioner would not even have to disclose a legal theory to the court, for the lack of a precedent squarely on point would be sufficient.[84]
Nor are petitioner's theories supported by the legislative history. Indeed, they are precluded by it.
Tested by relevant standards, therefore, petitioner's legal theories cannot support a finding of reasonable cause by this Court. Petitioner, moreover, must present his theories, for the limitation upon this Court's function in § 10(l) proceedings is based not only upon a congressionally determined policy of leaving the ultimate decision to the NLRB but also upon petitioner's own experience, expertise, and familiarity with labor problems. As this Court remarked during these proceedings, it would indeed be ironic on the one hand to pay tribute to petitioner's expertise and on the other to enjoin picketing on theories he has not advanced.[85]
One further word need be said. It is not the holding of this Court that petitioner must produce evidence in a § 10(l) proceeding indicating the NLRB will determine in the § 10(k) hearing that Local 59 is not entitled to the work. The holding is simply that these facts do not present a "dispute" cognizable by the Board under § 10(k), and § 8(b) (4) (D) is thereby rendered inoperative.[86]
Respondent's motion will be granted, and the petition dismissed.
The foregoing opinion is adopted as the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52 (a), 28 U.S.C.A.
Let an appropriate order in conformity herewith be submitted.
NOTES
[1] 29 U.S.C.A. § 160(l) (1960 Cumm. Supp.). Jurisdiction of this Court is founded upon that section. The record reflects that respondent Local 59 is a labor organization within the meaning of the Act transacting business within this judicial district, that the alleged unfair labor practice occurred within this district, and that the activities involved affect interstate commerce.
[2] 29 U.S.C.A. § 158(b) (4) (i) and (ii) (D) (1960 Cumm.Supp.).
[3] N.T. 20.
[4] N.T. 20, 125-6, 130.
[5] N.T. 10.
[6] N.T. 121-4, 165.
[7] N.T. 158.
[8] N.T. 15.
[9] N.T. 29-30.
[10] N.T. 24.
[11] N.T. 20.
[12] N.T. 38, 42.
[13] N.T. 13, 53.
[14] N.T. 42.
[15] N.T. 70.
[16] N.T. 67.
[17] N.T. 50, 67.
[18] N.T. 31 et seq.
[19] N.T. 32.
[20] N.T. 46, 57.
[21] N.T. 63.
[22] N.T. 73.
[23] N.T. 63.
[24] N.T. 73-4. The Court does not find this factor to be of legal significance and will in the course of this opinion occasionally speak of the dispute here as though Local 59 desired to work for Du Pont directly.
[25] N.T. 159-61.
[26] N.T. 146.
[27] N.T. 70.
[28] N.T. 54.
[29] N.T. 136 et seq.
[30] N.T. 66.
[31] N.T. 66, 144. In the course of these negotiations Sweeney again remarked that he had to do something to get his men on the job.
[32] N.T. 136-8, 165.
[33] N.T. 33.
[34] N.T. 36. The signs at all times have read: "On Strike Against Du Pont Company, Sheet Metal International Association, Local 59. We Are Defending Our Contract." N.T. 33.
[35] N.T. 35.
[36] N.T. 35. See Petitioner's Supplemental Memorandum, p. 10.
[37] In oral argument, Mr. Serot, counsel for petitioner, asserted all millwrights and ironworkers presently doing sheet metal work at Seaford will be discharged should Local 59 succeed. There is no evidence in the record to justify this assertion, and no such finding is made. The tremendous increase in volume of sheet metal work at hand would lead to the opposite conclusion absent more evidence on Local 59's demands and the number of men it presently has available for work at Seaford.
[38] See notes 67-75, infra, and accompanying text.
[39] The section applies to disputes between union and non-union groups. See note 78, infra, and accompanying text.
[40] 29 U.S.C.A. § 160(k).
[41] Petitioner has not challenged this proposition. In any case, both the language of the statute and its legislative history compel it. See notes 67-75, infra, and accompanying text.
[42] See Radio and Television Engineers, supra, 364 U.S. at page 577, 81 S.Ct. at page 333.
[43] Id., 364 U.S. at pages 577-578, 81 S. Ct. at pages 333-334.
[44] The doctrines adopted by the NLRB would, of course, encompass ordinary jurisdictional disputes between groups of employees. Nevertheless, such a dispute would not have to exist since the Board looked to purely legal considerations pertaining to the picketing union's right to the work. It did not consider factors relating to the group doing the work. In effect, then, no standards relevant to a determination of a dispute between rival groups of employees were applied.
[45] N. L. R. B. v. United Association of Journeymen, etc., 3 Cir., 1957, 242 F. 2d 722; N. L. R. B. v. United Brotherhood of Carpenters, etc., 7 Cir., 1958, 261 F.2d 166; N. L. R. B. v. Radio and Television Broadcast Engineers Union, Local 1212, 2 Cir., 1959, 272 F.2d 713.
[46] N. L. R. B. v. Local 450, International Union of Operating Engineers, 5 Cir., 1960, 275 F.2d 413.
[47] 364 U.S. 573, 576, 81 S.Ct. 330, 333.
[48] Id., 364 U.S. at page 586, 81 S.Ct. at page 338.
[49] Id., 364 U.S. at page 579, 81 S.Ct. at page 334.
[50] Id., 364 U.S. at pages 576-577, 81 S.Ct. at page 333.
[51] Petitioner's Supplemental Memorandum, p. 10. The strongest possible evidence of a "voluntary adjustment" would seem to be the cooperation of employees doing the work with the picketing union by refusing to cross the picket line. Indeed, this is more than cooperation, it is active support. Yet, even in that situation, petitioner would deny the existence of a "voluntary adjustment" or, conversely, the non-existence of a "dispute". Clearly, then, the employer's resistance is the factor, in petitioner's view, which renders the "voluntary adjustment" provisions inoperative. Yet, petitioner also claims that even though the employer must be a party to an adjustment of the dispute, he is not bound by the Board's § 10(k) determination of the dispute. See notes 53-54, infra, and accompanying text.

Petitioner's theories have demonstrated an unwillingness to depart from prior Board law even where necessary to comply with Radio and Television Engineers. The Board has held in the past that the employer must be a party to the "voluntary adjustment". Local 48, Sheet Metal Workers' International Association, 120 N.L.R.B. 221 (1958). Because the Board has previously refused to make an "assignment" in the § 10(k) hearing, the employer was not bound. See Local 472, International Laborers' Union, 123 N.L.R.B. 1776, 1782 n. 15 (1959).
[52] It is difficult to escape this conclusion since if all groups of employees agree on a settlement, the only dispute left to be determined is that between the picketing union and the employer.
[53] Petitioner's Supplemental Memorandum, pp. 12-3.
[54] Id. at 13, n. 4.
[55] Radio and Television Engineers, supra, 364 U.S. at page 575, 81 S.Ct. at page 332.
[56] Id., 364 U.S. at page 581, 81 S.Ct. at page 335.

By saying the § 10(k) determination is "compulsory" upon the employer, this Court does not intend to indicate the Board order must run directly against him. There is no need to determine that question here, for such an order, because it will be compulsory upon all groups of employees, will effectively "bind" the employer simply by restricting the alternatives open to him.
[57] Id., 364 U.S. at page 582, 81 S.Ct. at page 336. Because the Board has refused in the past to make an "assignment" in the § 10(k) hearing, the employer was not bound. See Local 472, International Laborers' Union, 123 N.L. R.B. 1776, 1782, n. 15 (1959).
[58] 364 U.S. 573, 582-583, 81 S.Ct. at page 336.
[59] Id., 364 U.S. at page 579, 81 S.Ct. at page 334.
[60] See note 56, supra.

It might also reach disputes between unions and employers over sub-contracting, strike replacements, and the like. Even before the Radio and Television Engineers decision, the NLRB itself realized such a broad interpretation of § 8 (b) (4) (D) raised many problems. See American Wire Weavers' Protective Association, 120 N.L.R.B. 977 (1958).
[61] See notes 67-75, infra, and accompanying text.
[62] Petitioner also relies upon Vincent for and on Behalf of N. L. R. B. v. Steamfitters' Local Union 395, 2 Cir., 1961, 288 F.2d 276, decided after Radio and Television Engineers. But that case contains no discussion of whether there must be a "dispute" between two groups of employees and doesn't mention § 10(k).
[63] That section provides for damage suits by private parties. There is now only a § 303(a) although it apparently covers the same range of activities as before. See 29 U.S.C.A. § 187(a) (1960 Cumm. Supp.).
[64] 342 U.S. 237, 245, 72 S.Ct. 235, 240.
[65] 364 U.S. 573, 585, 81 S.Ct. 330, 337.
[66] "The fact that the two sections have an identity of language and yet specify two different remedies is strong confirmation of our conclusion that the remedies provided were to be independent of each other. Certainly there is nothing in the language of § 303(a) (4) which makes its remedy dependent on any prior administrative determination that an unfair labor practice has been committed * * *. The fact that the Board must first attempt to resolve the dispute by means of a § 10(k) determination * * * is only a limitation on administrative power * * *." 342 U.S. 237, 244, 72 S.Ct. 235, 239.

Another factor should be noted. In Juneau Spruce, the Court emphasized that §§ 8(b) (4) (D), 10(k) and 303 presented separate remedies and procedures. It may be of no little significance, therefore, that in Radio and Television Engineers the Court said there need not be "substantive symmetry" (emphasis supplied), between the two schemes.
[67] Section 2(15) of the bill defined a jurisdictional strike as: "A strike against an employer, or other concerted interference with an employer's operations, an object of which is to require that particular work be assigned to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization, or in another trade, craft, or class." I N. L. R. B., Legislative History of the Labor-Management Relations Act of 1947, 42. (Hereinafter Leg.Hist.)
[68] I Leg.Hist. 315.
[69] Id. at 583.
[70] Id. at 615.
[71] Id. at 561.
[72] Section 8(b) (4) (D) rendered a strike unlawful where a purpose thereof was to force or require "any employer to assign to members of a particular labor organization work tasks assigned by an employer to members of some other labor organization unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work tasks." Id. at 113.
[73] II Leg.Hist. 951.
[74] Id. at 1005.
[75] Id. at 1012.
[76] This concession was apparently made in the erroneous belief that the original House bill did not contain the language in question. See transcript of oral argument, June 8, 1961, p. 9.
[77] II Leg.Hist. 1624.
[78] Petitioner has seized upon this one statement as support for his position. Even if it were such support, legislative history is meaningful only when read as a whole. Judged from that perspective petitioner finds little comfort indeed in the background of this statute. Section 8(b) (4) (D) was understood by Congress to apply only to ordinary jurisdictional disputes, and, as such, met little opposition in the legislative process. See II Leg.Hist. 1046 (remarks of Senator Murray).
[79] Petitioner has characterized the position now being taken by the Court as requiring that every non-union employee make an affirmative claim to the particular work before there can be a "dispute" cognizable under § 10(k). That is not the Court's position. What precise elements are necessary to constitute a "dispute" is not determined here, for this record is barren of any evidence which might support such a finding.
[80] See e. g. United States v. Hutcheson, 1941, 312 U.S. 219, 61 S.Ct. 463, 85 L. Ed. 788.
[81] The Court noted in that case that picketing had been equated to striking for purposes of § 13. 362 U.S. 274, 281 note 9, 80 S.Ct. 706, 710.
[82] This is not a holding that the presence of an economic preference on the part of an employer renders § 8(b) (4) (D) inoperative when there is a dispute between groups of employees over particular work. The purpose of § 8(b) (4) (D) and § 10(k) is not to aid the employer in the settlement of such issues but simply to remove him from the impossible position of being unable to satisfy two or more groups.
[83] "The Court: You may have a problem there, because under 10(k) it says you are only there where there is a dispute. Now, where is the dispute? * *

"Mr. Serot: I see that is a question. Our only contention here is basically that until that contention is decided through the proper channels, there should be no strike." Transcript of oral argument, June 8, 1961, p. 27.
[84] For practical purposes, petitioner has relied entirely on pre-Radio and Television Engineers NLRB rules, see e. g. note 51, supra, and accompanying text, to support his theory. He has pursued this course even when prior Board law is wholly irreconcilable with that Supreme Court decision. See e. g. note 57, supra, and accompanying text.
[85] This is not to indicate the Court believes there is such a theory. Nevertheless, counsel for petitioner have been given far more than the usual opportunity to educate this Court on why the picketing should be enjoined. The arguments presented being insufficient for the reasons stated, the petition must be dismissed.
[86] On June 21, 1961, this Court received a slip opinion of the Court of Appeals for the Third Circuit dealing with § 8 (b) (4) (D). Schauffler, for and on Behalf of N. L. R. B. v. Local 1291, International Longshoremen's Association, 3 Cir., 292 F.2d 182. Because the slip opinion was received on the date of the filing of this opinion, comment upon the decision will be reserved to this footnote. The Court of Appeals was not faced in that case with the problem in issue here. For all that appears in the opinion, there was an active dispute between the two unions involved. The principal defense of Local 1291 was that it had not engaged in a strike or a refusal to perform services for the proscribed purpose of subsection (D) since it was merely trying to enforce provisions of its collective agreement and a relevant decision of the grievance committee based upon that contract. See Local 1291, at page 187. Moreover, the Regional Director argued, and the Court apparently found, that the grievance committee had refused to decide the matter because a jurisdictional dispute was involved. Local 1291, at page 188. The issues raised and the matters decided in Local 1291, are, therefore, radically different from those presented here. It should be further noted that this Court's interpretation of "reasonable cause" finds full support in the Court of Appeals' opinion. See Local 1291, at page 188.