300 F.2d 832
 John J. CUNEO, Regional Director of the Twenty-Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD
v.
LOCAL NO. 825, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO, and Local No. 472, International Hod Carriers, Building and Common Laborers Union, AFL-CIO,*
Local No. 825, International Union of Operating Engineers, AFL-CIO, Appellant.
 No. 13699.
 United States Court of Appeals Third Circuit.
 Argued December 22, 1961.
 Decided March 20, 1962.
 
 Michael Breitkopf, Newark, N. J., for appellant.
 Winthrop A. Johns, Washington, D. C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Clifford M. Roth, Attorney, National Labor Relations Board, on the brief), for appellee.
 Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.
 KALODNER, Circuit Judge.
 
 
 1
 Appellant Engineers Union ("Engineers") appeals from a temporary injunction issued by the District Court in proceedings instituted by the Regional Director of the National Labor Relations Board ("Board") pursuant to Section 10 (l) of the National Labor Relations Act, as amended.[1] The temporary injunction restrained Engineers from engaging in unfair labor practices in violation of Sections 8(b) (4) (B) and (D) of the Act[2] which prohibit so-called secondary boycotts and certain conduct in furtherance of jurisdictional disputes, until final adjudication by the Board of pending charges relating to such practices.
 
 
 2
 The District Court, in an oral opinion,[3] found that "obviously there is or was a jurisdictional dispute" and that Engineers "indicate[s] no lack of intention to do the same thing again in the future." In its "Order Granting Temporary Injunction" the District Court stated it had found "there is reasonable cause to believe that respondent has engaged in, and is engaging in, acts and conduct in violation of Section 8(b) (4) (i) (ii) subparagraphs (B) and (D) of said Act * * * and that such acts and conduct will likely be repeated or continued unless enjoined."
 
 
 3
 The scope of our review on this appeal is limited to two considerations:[4]
 
 
 4
 (1) Was the District Court clearly erroneous under Rule 52(a), Fed.Rules Civ. Proc. 28 U.S.C.A., in its finding that Board had reasonable cause to believe that Engineers had engaged in an unfair labor practice or practices?; and
 
 
 5
 (2) Did the District Court abuse its judicial discretion in issuing the temporary injunction?
 
 
 6
 The facts as adduced by the testimony below and evidenced by the record may be summarized as follows:
 
 
 7
 On May 11 and 15, 1961, Nichols Electric Company ("Nichols") filed charges with John J. Cuneo, Regional Director of the Twenty-second Region of the National Labor Relations Board, alleging that Local No. 825, International Union of Operating Engineers, AFL-CIO ("Engineers") had engaged and was engaging in unfair labor practices proscribed by Sections 8(b) (4) (B) and (D) of the National Labor Relations Act ("Act").
 
 
 8
 After investigation, the Regional Director concluded the charges had merit and warranted proceedings before the National Labor Relations Board and petitioned the District Court for the injunction now under review.
 
 
 9
 The hearing before the District Court developed this situation:
 
 
 10
 Elmhurst Contracting Company ("Elmhurst") was awarded a contract by the State of New Jersey to construct the Spruce Run Reservoir near Clinton, New Jersey. Elmhurst sublet a $2,600,000 subcontract to Selby Drilling Corporation ("Selby") which in turn subcontracted to Nichols, an electrical contractor, the erection of an electric power line. The latter work necessitated the erection of poles from which the power line was to be strung. For the past ten or twelve years Nichols used an auger drill mounted on and powered by a truck to dig the holes for the poles and a boom attached to the truck to lift the poles into place. Nichols always assigned the operation of the auger and boom to its linemen, who are members of International Brotherhood of Electrical Workers, AFL-CIO ("Electricians"). Nichols had no contract with Engineers for the operation of this equipment; Engineers were never certified by the Board as the collective bargaining representative of any of Nichols' employees; and Nichols had not been ordered by the Board to bargain with Engineers. The latter, however, had contracts with Elmhurst and Selby recognizing it as the bargaining representative for all employees operating power equipment of the kind here involved. These contracts contain the following clause:
 
 
 11
 "This Agreement shall bind all sub-contractors while working for an Employer who is a party to this Agreement. Any Employer who sublets any of his work must sublet the same subject to all the terms and conditions of this Agreement."
 
 
 12
 On May 3, 1961, Nichols' men arrived at the reservoir site with the powered auger and boom to dig the holes and set the poles for the power line. One Gatti, who was Engineers' job steward and an employee of Selby, told Nichols' linemen, "You don't dig those holes with that machine. That is the Operating Engineers' work". Nichols' supervisor, O'Brien, then spoke to Yanuzzi, Selby's lead mechanic in charge of Selby's operating engineers, and was told by him that Nichols would have to hire members of Engineers to operate the auger and boom. After consulting with Shaffer, Electricians' business agent, who claimed that operation of the equipment was Electricians' work, O'Brien decided not to hire Engineers' members, and the next day Nichols' employees dug three holes manually.[5] On May 9th, Nichols again brought its power equipment to the job site, and its employees started digging holes with the power-driven auger. Gatti immediately summoned fifteen to twenty members of Engineers employed on the job by Selby and Elmhurst and said to them, "See what they are doing? They are taking your work away from you." At Gatti's direction some of the engineers stood in front of the truck so that is could not be moved; the remainder sat on the power line poles which were lying alongside the truck. Yanuzzi advised the members of Engineers to return to work but they refused. When O'Brien sought assistance from a State Trooper, Gatti said that the auger was the type of equipment used by engineers and that Nichols' linemen "were not going to use it." Finally, at 3:30 in the afternoon, after the work stoppage had been in progress for three or four hours, Nichols removed the equipment, and the engineers immediately returned to work. Thereafter Nichols' employees dug the holes manually without interference from Engineers. On May 17, 1961 at a meeting held in Newark at the request of a representative of the State of New Jersey, Engineers' business agent claimed that the operation of this type of equipment belonged to his members; Electricians' business agent, on the other hand, claimed that the operation of this equipment on power line construction was Electricians' work that had been performed by members of his local for at least thirty years.
 
 
 13
 By the time of the hearing in the court below on June 14, 1961, Nichols had almost completed the work on its subcontract with Selby.[6] However, the dispute between Electricians and Engineers as to whose members should operate the power equipment had not been settled; and Elmhurst's project manager, while admitting that there was very little, and possibly not any, electrical work to be done on the project, nevertheless testified that Nichols was one of several companies which at Elmhurst's request had submitted estimates on further electrical work to be performed at the Spruce Run Reservoir. Nichols' headquarters were in New Jersey and Nichols had engaged in power line construction in that State on a number of occasions during the preceding several years.
 
 
 14
 The District Court, in its oral opinion, expressed agreement with the version of the events as described in the evidence above summarized.
 
 
 15
 In its "Order Granting Temporary Injunction" the District Court enjoined Engineers from engaging in specified conduct designed (1) "to force or require" Selby, Elmhurst or others "to cease doing business with" Nichols, and (2) to compel Nichols to assign the operation of its power equipment to Engineers.
 
 
 16
 On this appeal Engineers urges (1) there did not exist a "jurisdictional dispute" between it and Electricians and that the sole dispute was between it and Nichols, and accordingly there was no basis for the application of Section 8(b) (4) (D); and (2) the issuance of the temporary injunction was in error since "the facts of the present case do not support" its issuance.
 
 
 17
 On review of the record we cannot say that the District Court was "clearly erroneous" in its fact-finding "that there is reasonable cause to believe that respondent [Engineers] has engaged in, and is engaging in, acts and conduct in violation of Section 8(b) (4) (i) (ii) subparagraphs (B) and (D) * * * and that such acts and conduct will likely be repeated or continued unless enjoined."[7] Nor can we say that the District Court abused its discretion in issuing the temporary injunction under the evidence earlier recited.[8] Since the scope of our review "is limited to a determination whether the district court's finding that there is reasonable cause to believe that a violation of the Act as charged has been committed is clearly erroneous" and whether the District Court abused its discretion in granting injunctive relief,[9] further consideration becomes unnecessary. Penello v. Local No. 59 Sheet Metal Workers, 195 F.Supp. 458 (D.Del.1961) cited by Engineers is inapposite on its facts.
 
 
 18
 For the reasons stated the Order Granting Temporary Injunction will be affirmed.
 
 
 
 Notes:
 
 
 *
 Proceedings against Local No. 472, International Hod Carriers, Building and Common Laborers Union, AFL-CIO were discontinued below
 
 
 [1]
 29 U.S.C.A. § 160(l); 73 Stat. 544.
 
 
 [2]
 29 U.S.C.A. § 158(b) (4) (B) and (D). The sections stated, in pertinent part, provide:
 "(b) It shall be an unfair labor practice for a labor organization or its agents —
 * * * * *
 "(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is —
 * * * * *
 "(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *.
 * * * * *
 "(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: * * *."
 
 
 [3]
 It is regrettable that the District Court did not, as required by Rule 52(a), Fed. Rules Civ.Proc. "find the facts specially and state separately its conclusions of law thereon."
 
 
 [4]
 In Schauffler v. Local 1291, International Longshoremen's Association, 292 F.2d 182 (1961) Chief Judge Biggs, speaking for this Court said (p. 187):
 "* * * the scope of * * * [this Court's] review of Section 10(l) proceedings is limited to a determination whether the district court's finding that there is reasonable cause to believe that a violation of the Act as charged has been committed is clearly erroneous. In applying this standard it must be borne in mind that a Section 10(l) injunction is interlocutory in nature and only remains in force pending the final adjudication of the Board with respect to the unfair labor practice charge. The Section 10(l) procedure reflects the congressional determination that certain unfair labor practices are so disruptive that where there is reasonable cause to believe that they are being engaged in their continuance during the pendency of charges before the Board should not be permitted. * * * The Board need not show that an unfair labor practice has been committed, but need only demonstrate that there is reasonable cause to believe that the elements of an unfair labor practice are present. Nor need the Board conclusively show the validity of the propositions of law underlying its charge; it is required to demonstrate merely that the propositions of law which it has applied to the charge are substantial and not frivolous (citing cases). The final adjudication of the Board of both questions of fact and law is, of course, ultimately reviewable by this court pursuant to Section 10(e) and Section 10(f) of the N. L. R. A."
 To the same effect see Schauffler v. Highway Truck Drivers and Helpers, 230 F. 2d 7, 9 (3 Cir. 1956).
 
 
 [5]
 Yanuzzi testified that on May 3d, O'Brien agreed to hire engineers to operate the power equipment but that O'Brien refused to put them to work when they arrived. O'Brien denied that he agreed to hire engineers or that engineers came to operate the equipment. The trial judge adverted to, but did not resolve, this dispute in the testimony
 
 
 [6]
 The use of the power equipment had been completed. The only remaining work to be done was to string wire on seven or eight poles
 
 
 [7]
 "Order Granting Temporary Injunction"
 
 
 [8]
 The circumstance that the particular job had been completed did not foreclose the granting of injunctive relief in view of the District Court's specific holding that Engineers' "acts and conduct will likely be repeated or continued unless enjoined." Schauffler v. United Association of Journeymen, 218 F.2d 476, 480 (3 Cir. 1955); Shore v. Building & Construction Trades Council, 173 F.2d 678, 682 (3 Cir. 1949): "It is clear as a general proposition of equity that the granting of an injunction is not foreclosed because the act feared has already happened, if there is reasonable grounds for believing that it will be done again."
 
 
 [9]
 See Note 4, supra